**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **NEPHTALI DE LEON**, | : | |
| | : | |
| *Plaintiff*, | : | |
| | : | |
| v. | : | |
| | : | **Case No. 5:24-cv-00849** |
| **CITY OF SAN ANTONIO, TEXAS**, | : | |
| | : | **JURY TRIAL DEMANDED** |
| & | : | |
| | : | |
| **KRYSTAL JONES**, Executive Director of | : | |
| the Department of Arts and Culture of the | : | |
| City of San Antonio, in her official and | : | |
| individual capacities, | : | |
| *Defendants*. | : | |

## COMPLAINT

Plaintiff Nephtalí De León, by and through undersigned counsel, hereby states and alleges as follows:

## INTRODUCTION

1.    For over half a century, Plaintiff Nephtalí De León has dedicated his career as a poet, writer, and artist to the advancement and celebration of Chicano culture and language. Throughout his career, Mr. De León has striven to shine a light on the complex struggles and turbulent historical underpinnings of the Chicano community, as well as its resilience, cultural vitality, and linguistic creativity.  Mr. De León is also a dedicated cultural activist who has worked over the last 50 years to dismantle the stigmatization and alienation that Chicanos have faced in America by building an inclusive platform for his work that unifies, rather than divides, and which champions the spirit and diversity of not only the Chicano community, but of all people and cultures.

2.      Born in 1945 near the Texas-Mexico border and raised by migrant parents who traveled through parts of Texas for work, Mr. De León is among the founding fathers of Chicano literature.  Mr. De León's generation launched the Chicano literary movement in the mid-1960s and 1970s, establishing for the first time a nationally recognized platform for Chicano arts and literature.[1]  Mr. De León is recognized as among the important Chicano writers to emerge during this period, who first introduced American society to the Chicano community's distinct voice and culture.[2]

3.      For Mr. De León, being a Chicano means being neither Mexican nor American— but rather something unique that is not limited or defined by modern geographical borders.  He perceives the unique qualities of his culture to be reflected in the Chicano language Caló, a dynamic code-switching dialect,[3] which combines English, Spanish, ancient Nahuatl, and Spanish Romani.  For that reason, throughout his life, Mr. De León has incorporated Caló into his writing and poetry, as well as his speech.

4.      By incorporating Caló into his writing, Mr. De León hopes to revive what he views as a rich yet misunderstood language and culture.  Prior to the Chicano civil rights movement in the 1960s, Caló was stigmatized by many in America as a low-class and/or gang-related language, and even the word "Chicano" was deemed a racial slur.[4]  Such negative stereotypes arose largely as a result of decades of discrimination, segregation, and police brutality directed toward Mexican Americans, following the transfer of Texas, California, and the modern-day American Southwest

---

[1] https://www.tshaonline.org/handbook/entries/chicano-literary-renaissance.

[2] *Id.*

[3] Code switching is a linguistic practice of bi- and multilingual speakers who shift from one language or dialect to another within the same conversation or discourse (sometimes within the same sentence).

[4] https://www.history.com/news/chicano-movement.

from Mexico to the United States in 1848 at the end of the Mexican-American War.[5]  Those who were living in the ceded territory were effectively living in Mexico one day and in the United States the next.  And for the next several decades, these new "Mexican Americans" found themselves immersed in a foreign culture dominated by the English language, in which they were deprived of government representation and forced to contend with a substantial loss of rights, land ownership, and employment opportunities.[6]  Indeed, it was only in 1954 that Mexican Americans were first recognized as being entitled to equal protection of the laws, as guaranteed by the Fourteenth Amendment to all persons who step foot on American soil.[7]

5.      The Chicano civil rights movement ultimately succeeded in gaining many reforms and civil rights for Mexican Americans.  Chicanos today, however, continue to grapple with biases and stereotypes that have, among other things, stigmatized the Chicano speech community and denigrated Caló.[8]

6.      Within Mr. De León's lifetime, he has witnessed the word (and concept of) "Chicano" evolve from its designation as a racial slur to it now being embraced as a term of identity and pride.  He hopes to see Chicano language follow the same positive trajectory as the Chicano identity.  Mr. De León has thus striven to help eliminate the restrictive and pejorative labels that have been imposed on Caló over the years by promoting its social, historical, and literary functions within the Chicano community—and by enthusiastically sharing it with anyone he can.

---

[5] This was one result of the Treaty of Guadalupe Hidalgo, which brought an official end to the Mexican-American War. *See* https://www.archives.gov/milestone-documents/treaty-of-guadalupe-hidalgo.

[6] https://mexiconewsdaily.com/culture/chicano-the-rise-of-mexican-american-culture-in-the-u-s/?utm_source=newsletter_free.

[7] *See Hernandez v. Texas*, 347 U.S. 475 (1954).

[8] D. Letticia Galindo, "Dispelling the Male-Only Myth: Chicanas and Calo," *Bilingual Review / La Revista Bilingüe*, Vol. 17, No. 1 (JANUARY-APRIL 1992), pp. 3-35; *see also* https://www.byarcadia.org/post/linguistic-identity-a-chicano-journey-of-language-resistance-tale.

7.      Mr. De Leon believes that the way in which speakers view their own language—and languages, generally—directly impacts the way that they view themselves, their culture, and their social status, particularly in a highly diverse and multicultural nation like the United States.[9]

8.      For that reason, among others, Mr. De León was overjoyed to learn in March 2023 that he had been chosen to serve as the City of San Antonio's official poet laureate for the next three years.  With this opportunity, Mr. De León hoped to share his language, culture, and the vibrancy of the Chicano community with San Antonio and, in doing so, challenge the biases that continue to impact Caló.

9.      At Mr. De León's investiture ceremony on April 10, 2023, San Antonio Mayor Ron Nirenberg officially appointed Mr. De León as San Antonio's poet laureate.  During the ceremony, Mayor Nirenberg aptly stated of the role of artists and of Mr. De León:

> "Artists challenge standard views and narratives, and create new approaches to view ourselves in our city.  That is certainly the case of Mr. De León.  Born in Laredo, the son of migrant workers, he's been challenging the standard narrative his entire life.  And anyone who knows him, or has known him, understands that to be true."[10]

10.      Four months later, Mr. De León's supposed opportunity to "challenge standard views and narratives" and to share the magic of his culture through his poetry was cut short, and his reputation and life's work blighted.

11.      On August 14, 2023, the City informed Mr. De León that his contract as poet laureate would be terminated due to a "racial slur" that he had allegedly included in a poem.  The

---

[9] The value of a language "always goes hand in hand with the social status of the communities that use it," and, over time, "valuations of languages and communities shift in response to changing socio-historical circumstances." Mariana Achugar, *Counter-hegemonic language practices and ideologies*, Spanish in Context 5:1, at 2-5 (2008) (discussing the struggles that Spanish speakers in the Southwest faced for decades following the Mexican-American War, including the notion driven by the English-speaking majority that "correct" or "proper" language skills could be used to justify social inequalities).

[10] https://www.youtube.com/watch?v=UhjG3yw_TrY&ab_channel=DepartmentofArts%26Culture%2CCityofSanAntonio.

City provided Mr. De León with no notice, no opportunity to defend himself, and failed even to specify the name of the poem at issue or the racial slur that he had purportedly used. Within 24 hours, the City made the termination public, releasing the following defamatory press statement, among other public statements, which rapidly immersed Mr. De León in a nightmarish media frenzy, in which countless news and media outlets reported on the termination of San Antonio's former poet laureate for his use of a "racial slur":

> "The City of San Antonio's Department of Arts & Culture is committed to championing policies and practices that empower a just, inclusive, and equitable city which aligns with the City of San Antonio's mission statement and core values. The City of San Antonio's Poet Laureate is to uphold these values, which include denouncing racism among other oppressive barriers, while using creative poetic expressions to unite our community. Nephtalí De León recently posted a poem contrary to the City's values and the role of City Poet Laureate. As a result, Mr. De León's contract with the City of San Antonio has been terminated."[11]

12. The purported racial slur which the City felt justified the obliteration of Mr. De León's role in San Antonio and reputation throughout the country was the word "mayate," which, in Caló, can be used to refer to June bugs, the color black, or to Black people. Mr. De León used the term in the context of an elegy, which he had posted on his personal Facebook page in honor of Dr. Roberto 'Cintli' Rodriguez, a long-time friend and fellow Chicano writer-activist who had passed away. Mr. De León did not post the poem in his capacity as Poet Laureate, but in his individual capacity, to celebrate the life of a friend and celebrated figure within the Chicano community whom Mr. De León viewed as a unifying force among people of all backgrounds and races. Indeed, the single line of the elegy in which Mr. De León used the term "mayate" describes his friend Mr. Rodriguez as follows: "he touched so many Raza[,] gavachos y mayates, he touched everyone between two cultures and two nations."

---

[11] https://foxsanantonio.com/newsletter-daily/san-antonios-poet-laureate-fired-over-racial-slur-in-poem-arts-culture-author-four-months-august-values.

13.     In the context of his poem, incorporating Chicano Caló as Mr. De León understands it, the English translation of "Raza[,] gavachos y mayates" is "Chicanos, Whites and Blacks." Never did Mr. De León imagine that his use of "mayate" in an elegy—dedicated to a fellow Chicano who had dedicated his life to fighting racial injustice—could be so distorted and stripped of context that it would be misconstrued as meaning the exact opposite of what he had intended. Mr. De León believed that the City of San Antonio had granted him the opportunity as Poet Laureate to share his poetry in his own authentic language—and to "challenge the standard views and narratives," including those that denigrate his own culture and native tongue.

14.     Sadly, Mr. De León was mistaken.  As a result of Defendants' unconstitutional and defamatory actions, Mr. De León's reputation and life's work have been reduced to the theme of the headlines that now dominate the Google search results of "Nephtalí De León": "San Antonio fires poet laureate for using racial slur in a poem."

**JURISDICTION AND VENUE**

15.     This action raises federal questions under the First and Fourteenth Amendments of the United States Constitution, as well as the Civil Rights Act of 1871, 42. U.S.C. § 1983.

16.     This Court has original jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1343, as well as supplemental jurisdiction pursuant to 28 U.S.C. § 1367 over Plaintiff's state claims.

17.     This Court may issue a declaratory judgment and grant permanent injunctive relief pursuant to 28 U.S.C §§ 2201–2202.  This Court may award damages and equitable or other relief for the protection of civil rights pursuant to 28 U.S.C. § 1343.

18.     Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(1)–(2).

**PARTIES**

19.     Plaintiff Nephtalí De León is a 79-year-old Chicano poet, writer, artist, and civic activist.  Mr. De León currently resides in San Antonio, Texas.

20.     Defendant City of San Antonio (the "City") is a municipality located in Bexar County, Texas, with a population of approximately 1.5 million.

21.     Defendant Krystal Jones is the Executive Director of the City's Department of Arts and Culture (the "Department").  As Executive Director, Ms. Jones oversees the Department's budget and operations and is responsible for the planning, oversight, and execution of Department programs, including the City's Poet Laureate program.  She is sued in her individual and official capacities.

22.     Defendant City of San Antonio and Defendant Krystal Jones are collectively referred to as "the City" in this Complaint.

**STATEMENT OF FACTS**

**I.     NEPHTALI DE LEON**

23.     Plaintiff Nephtalí De León is an American citizen of Mexican descent and a full-time poet, writer, and artist.  Born in 1945, Mr. De León is the son of migrant workers who lived and traveled for work throughout Texas.

24.     As a child, Mr. De León worked alongside his parents and his three older siblings, helping to pick chiles, tomatoes, lettuce, oranges, and cantaloupes.  Due to the nature of his parents' work, Mr. De León was frequently on the move as a student, so he attended a number of different schools in small Texan communities through high school.

25.     Throughout his childhood, Mr. De León spoke Spanish with his parents and siblings at home.  At school, however, he was taught only in English.  Although nearly all of his classmates

were Mexican-American, most of Mr. De León's teachers were White, did not speak Spanish, and would spank the students if they spoke any language but English.[12]

26.     Mr. De León is fluent in English, Spanish, and Chicano Caló, a code-switching dialect, which combines English, Spanish, Nahuatl, and Spanish Romani (also known as "Caló," spoken by the Roma people in Catalonia and Spain).

27.     Mr. De León frequently writes and speaks in Chicano Caló.  An ardent linguist, Mr. De León is also currently studying Mandarin Chinese.  Additionally, he is knowledgeable in French and Nahuatl, an Uto-Aztecan language of Central Mexico, which his mother taught him as a child.

28.     Mr. De León has been recognized as one of the first Chicano writers to introduce American society to Chicano arts and literature,[13] which first gained national recognition and a distinct cultural platform in the late-1960s and early 1970s.[14]

29.     Among the founding fathers of Chicano arts and literature, Mr. De León played a significant role in introducing American society to the Chicano community's distinctive voice, creativity, and cross-cultural heritage.

30.     His first book, *Chicanos: Our Background and Our Pride*, was written during Mr. De León's senior year of high school and published thereafter.  The book examines Chicano history and cultural evolution from the time of the Aztecs to the present.  The seminal book received both

---

[12] Until the passage of the Bilingual Education Act of 1968, Spanish and other native languages were criminalized in public schools. *See* https://www.britannica.com/topic/Bilingual-Education-Act.

[13] https://www.tshaonline.org/handbook/entries/chicano-literary-renaissance.

[14] https://anaya.unm.edu/chicanoliterature.

8

domestic and international acclaim, and several editions have been published, including an edition published in 2011 by the University of Valencia.

31.  In 1968, Mr. De León founded and served for several years as the editor and publisher of the first bilingual, bicultural newspaper in West Texas, *La Voz de los Llanos* ("The Voice of the Plains"), which reported on racial and societal injustices that were occurring within the community.

32.  In the early 1970s, Mr. De León established the Teatro Chicano in Lubbock, Texas, for which Mr. De León wrote the plays and recruited local residents and university students to perform.  Mr. De León's plays emphasized the inequalities and struggles faced by the Chicano community, as well as its rich culture and boundless creativity.

33.  Mr. De León's writing includes poetry, children's books, plays, and essays, which have been published in the United States, Mexico, Spain, and France and translated into numerous foreign languages.

34.  For over half a century, Mr. De León has dedicated himself to the study, advancement, and celebration of Chicano culture, history, and language through his writing and artwork.  He has traveled across the country, sharing his poetry, giving lectures, and teaching courses in creative writing, poetry, and the humanities and culture at various schools, universities, and cultural organizations, from Texas to Washington, D.C. to Hawaii.

35.  One of Mr. De León's primary sources of income is public engagement, which includes public speaking events, lectures, poetry readings, and student programs to teach students to cultivate their poetry and creative writing skills in English, Spanish, and Caló.  Mr. De León strives to share his passion for linguistics with his students and enjoys introducing them to other foreign languages, as well, including French, Aztec Nahuatl, and, most recently, Chinese.

9

36.    A major focus of Mr. De León's writing has been the study, evolution, and creative use of languages, including, in particular, Caló, which Mr. De León has incorporated into his poetry for decades.

37.    One of Mr. De León's missions as a poet and writer has been to share with the public, through his writing and artwork, the magic, fortitude, and heart of the Chicano community, as a means to counter the social oppression and injustices that the people have suffered throughout their history.

38.    Mr. De León believes that Chicano Caló has been erroneously stigmatized by certain segments of American society as a low-class, gang-related, or offensive language—largely as a result of the negative stereotypes that arose in the United States after decades of discrimination, segregation, and police brutality directed toward Mexican Americans prior to (and during) the Chicano civil rights movement in the 1960s and 1970s.[15] [16]

39.    Through his work and activism, Mr. De León has dedicated himself to the revival, affirmation, and redemption of Caló, which Mr. De León believes is a rich, unique language, reflective of both the Chicano community's ancient origins, as well its ever-evolving creativity and dynamic role in contemporary society.

---

[15] https://www.history.com/news/chicano-movement; D. Letticia Galindo, *Dispelling the Male-Only Myth: Chicanas and Calo*, Bilingual Review / La Revista Bilingüe, Vol. 17, No. 1, at 3-35 (January-April 1992); https://www.byarcadia.org/post/linguistic-identity-a-chicano-journey-of-language-resistance-tale.

[16] *See also* Jennifer Leeman, *Critical Language Awareness and Spanish as a Heritage Language: Challenging the linguistic subordination of US Latinxs*, Handbook of Spanish as a Minority/Heritage Language, at 345-58 (2018) (discussing the stigmatization of "non-standard" Spanish speakers in America, including Chicanos, and the characterization of "non-standard" varieties of Spanish or English as inappropriate, incorrect, or unacceptable).

## II.    THE POET LAUREATE POSITION

40.    In 2012, San Antonio was the first major city in Texas to appoint its own Poet Laureate.[17]

41.    The City's Poet Laureate program serves to culturally benefit the San Antonio community.

42.    The duty of the Poet Laureate is "to promote poetry and the literary arts in San Antonio and [the Poet Laureate] is tasked with developing innovative and inspiring public events and programs in conjunction with local organizations and the Department of Arts & Culture."[18]

43.    According to the City's 2023–2026 Poet Laureate Nomination Guidelines, to be eligible for the position of Poet Laureate, in addition to being at least 21 years old, a candidate must: (i) be nominated for the position, (ii) pass a standard background check, (iii) have a "compelling portfolio of published work, (none that are self-published or by a vanity press)," (iv) have an "established history of activity in the San Antonio literary community, i.e., readings, publications, public presentations and/or teaching," (v) be "able and available to reach San Antonio audiences through travel or other means," and (vi) must have resided in San Antonio "for at least 3 years prior to the nomination deadline, and remain a resident throughout the [three]-year term."[19]

44.    According to the City's guidelines, the 2023–2026 Poet Laureate would be selected among other eligible nominees by a committee of nationally recognized poets from throughout the

---

[17] https://www.getcreativesanantonio.com/About-Us/Dept-Initiatives/Poet-Laureate.

[18] *Id.*

[19] https://www.getcreativesanantonio.com/Portals/3/Files/a.%202023-2026%20Poet%20Laureate%20Nomination%20Guidelines.pdf?ver=2022-11-22-141542-517.

United States.[20]  Once selected, the City's Mayor would then formally appoint the committee's nominee as the Poet Laureate to serve for a three-year term.[21]

45.    Mr. De León was nominated and ultimately selected to serve as the City's Poet Laureate from April 1, 2023 until March 31, 2026.

46.    In a March 20, 2023 press release, the City announced that Nephtalí De León would serve as San Antonio's sixth Poet Laureate.[22]  Defendant Krystal Jones stated in the press release that "[Mr. De León's] work in the community is exemplary of the role of a Poet Laureate" and that he "is one of the most prolific Chicano writers in the literary world today and his lyrical poetry and other artistic expressions have touched the lives of so many, both here in San Antonio and across the globe."[23]

47.    After learning that he had been selected, Mr. De León stated that he saw the position of Poet Laureate as a unifying force, "one of embracing our common denominators being together as a city, as a people, as a community."[24]

48.    On April 1, 2023, the City of San Antonio, acting through Defendant Jones, its Executive Director[25] of the City's Department of Arts and Culture, entered into a professional services agreement with Mr. De León, which formalized his appointment as Poet Laureate and set forth the contractual terms of the position. Ex. A (the "Agreement").

---

[20] *Id.*

[21] *Id.*

[22] https://www.sa.gov/Directory/News/News-Releases/City-of-San-Antonio-Announces-Nephtali-De-Leon-as-2023-2025-San-Antonio-Poet-Laureate.

[23] *Id.*

[24] https://sanantonioreport.org/nephtali-de-leon-selected-as-san-antonios-new-poet-laureate/.

[25] Defendant Krystal Jones is and was the Department's Executive Director at all times relevant to this Complaint.

49.     Pursuant to the Agreement, Mr. De León was hired by the City as a "Contractor" to serve as Poet Laureate for a three-year period, from April 1, 2023 until March 31, 2026. *Id*. at 1.

50.     Under Article III of the Agreement ("Scope of Services"), Mr. De León was to provide the following services in exchange for the compensation described below:

a. Assist the Department of Arts & Culture in generating public interest in the arts;

b. Promote literacy in the community;

c. Preserve the art of poetry;

d. Participate in a minimum of two City-sponsored public events, mutually selected by City and Contractor, during the three-year term (April 1, 2023 – March 31, 2026) of this Agreement;

e. Assist the Department of Arts & Culture in celebrating and inspiring the reading and writing of poetry in the community;

f. Assist the Department of Arts & Culture in developing a series of poetry programs and activities to celebrate San Antonio's people, places, and history;

g. Develop a single Poet Laureate Signature Initiative to be approved by the Department of Arts & Culture and to be planned, developed, and completed by February 28, 2025 ("Signature Initiative"); and

h. Present project plan outlining Signature Initiative that includes: project scope/concept; proposed timeline of Signature Initiative development including schedule of events and marketing initiatives; proposed budget; key partners (if applicable); and proposed location(s) (if applicable) no later than April 1, 2024 ("Project Plan"). Any changes required by City will be included by April 23, 2024.

*Id*. at 1–2.

51.     Article III also provides that Mr. De León would agree to be interviewed by news outlets interested in interviewing the Poet Laureate, and that Mr. De León would agree to mention the Department in "at least three positive social media posts, and whenever applicable in interviews/public appearances." *Id*. at 2.

52.     In compensation for his services, Mr. De León would receive a total of $10,500, to be paid in three installments of $3,500. *Id*. at 2-3. The City would owe Mr. De León the first installment upon execution of the Agreement, the second installment upon Mr. De León's

13

submission of a "Project Plan" (defined above) and the City's acceptance of such plan, and the third installment on April 1, 2025. *Id.*

53.     Mr. De León received his first installment of $3,500 from the City.  He has received no further compensation from the City for his services as Poet Laureate.

54.     All work performed under the Agreement by Mr. De León was to be performed "to the satisfaction of [Defendant Jones]." *Id.* at 2.  If Defendant Jones were to deem Mr. De León's work unsatisfactory, the City could terminate the Agreement "in accordance with Article VII. Termination." *Id.*

55.     Under Article VII (Section 7.2), in order to terminate the Agreement without cause, the terminating party would first be required to provide "10 calendar days written notice" to the non-terminating party. *Id.* at 4.

56.     Article VII (Section 7.3) provides that the City could terminate the Agreement "for cause" only upon the occurrence of Mr. De León's "sale, transfer, pledge, conveyance or assignment of this Agreement without prior approval." *Id.*

57.     Article VII (Section 7.4) also provides that, if Mr. De León were to default in his performance of the Agreement, the City would be required to provide Mr. De León with written notice of the default and to allow him 15 calendar days following receipt of such notice to cure the specified default. *Id.*

58.     The Agreement defines an "event of default" as either: (1) "Failing to perform or failing to comply with any covenant herein required," or (2) "Performing unsatisfactorily." *Id.*

59.     The City would only have the right to terminate the Agreement without further notice if Mr. De León were to fail to cure the default within such 15-day period. *Id.*

14

60.     Pursuant to section 17.2 of the Agreement, Mr. De León agreed to comply with the City's Non-Discrimination Ordinance,[26] which prohibits discrimination "on the basis of race, color, religion, national origin, sex, sexual orientation, gender identity, veteran status, age or disability, unless exempted by state or federal law, or as otherwise established in this Agreement." *Id*. at 9.

61.     The Agreement constituted the "final and entire agreement" between the City and Mr. De León, and "no waiver, change, modification or discharge by either Party of any provision" of the Agreement could be deemed effective unless expressed in writing and signed by both parties. *Id*. at 10–11.

### III.     MR. DE LEON'S ELEGY

62.     On July 31, 2023, Roberto Rodriguez, Ph.D., a long-time friend of Mr. De León, passed away.  Dr. Rodriguez was a professor of Mexican-American studies and a prolific Chicano writer and nationally syndicated columnist who was well known for his activism against racial injustice and police brutality.[27]

63.     On August 1, 2023, Mr. De León posted a poem on his personal Facebook account entitled "Dr. Roberto 'Cintli' Rodriguez (adiosito carnal),"[28] which he had written as an elegy to honor both a friend and a renowned figure within the Chicano community. Ex. B (the "Elegy Poem").

64.     Mr. De León's Elegy Poem post on Facebook makes no reference to the City, the Department, or the Poet Laureate position.

---

[26] https://www.sanantonio.gov/Portals/0/Files/DIO/R_10799_20130920105009.pdf.

[27] *See* https://www.npr.org/2023/08/04/1192070333/prolific-writer-on-chicano-life-roberto-rodriguez-dies-at-69.

[28] The phrase "adiosito carnal" means "goodbye brother" in Chicano Caló.

65.     Mr. De León did not post the Elegy Poem in his capacity as Poet Laureate, but rather in his individual capacity.

66.     The Elegy Poem, written in code-switching English, Spanish, and Chicano Caló, celebrates Dr. Rodriguez as a unifying force who "touched so many Raza[,] gavachos y mayates, he touched everyone between two cultures and two nations."  *Id.*  The English translation of "Raza[,] gavachos y mayates" in the context of Mr. De León's poem is "Chicanos, Whites and Blacks."

67.     Mr. De León also posted the Elegy Poem on Facebook to serve as commentary on the evolution of Chicano language and identity in the United States.

68.     In his post of the Elegy Poem, Mr. De León included a photograph and quote by Dr. Rodriguez, which discusses how the word "Chicano" was once associated with criminality, even among other Mexican Americans ("Raza").  The photograph and full quote are shown below:



69.     Initially, Mr. De León received only positive feedback on the Elegy Poem from his Facebook followers.

70.    On August 2, 2023, Juan Tejeda—an acquaintance of Mr. De León's with whom Mr. De León shares negative personal history—posted a comment on the Elegy Poem, questioning the propriety of Mr. De León's use of the word "mayates." While acknowledging in his comment that "the same word can mean different things for different Spanish-speaking cultures," Mr. Tejeda also included an open question for Mr. De León's Facebook followers: "How about the rest of you? How do you feel about using the word mayate for Black people? Is it racist?" Mr. Tejeda's full comment is shown below:

 **Juan Tejeda**
Carnal Nephtali De Leon, I like your poema/canto for Dr. Cintli, however in it you use the word "mayate" to denote Black people. I know that the same word can mean different things for different Spanish-speaking cultures. However, are you aware that the word mayate can also have a racist origin and connotation? What is your understanding of the word in the Chicanx culture and how are you using it in Cintli's poem? How about the rest of you? How do you feel about using the word mayate for Black people? Is it racist? Is it the same or different as using gringos or gabachos for White people?

45w    Like    Reply     15

71.    Mr. Tejeda's comment ignited a debate over Mr. De León's poem on Facebook. Certain Facebook users condemned Mr. De León's choice of the word "mayates" as an offensive or racist term, while others defended Mr. De León and his use of the Chicano Caló term in the respectful context of an elegy dedicated to a fellow Chicano activist who had fought to eliminate racial injustice.

72.    On August 9, 2023, Mr. De León responded to Mr. Tejeda's comment on Facebook, apologizing "to anyone that may [have been] offended by [his] use of Caló words." *See* Ex. C.

73.    In his response, Mr. De León strongly disagreed with the denunciation of his use of "mayates" in the Elegy Poem as racist. Mr. De León explained his knowledge and understanding of "mayate" as a term derived from the Nahuatl word "mayatl" (beetle), which held

no racist or derogatory connotations at its origin, and which, in Chicano Caló, remains a neutral term today, as correctly used and understood.

74.    It is Mr. De León's position that any racist or derogatory connotations associated with the term "mayate" are born of the biases and influence of the dominant English-speaking American culture and its sensitivities toward the nation's prior history of slavery.

75.    As opposed to the "n-word" in the United States, Mr. De León has explained, the word "mayate" did not originate in racism or slavery, and those who speak Chicano Caló do not assign derogatory meaning to the word when they use it.  Chicanos do not share this portion of America's history, and there are no terms in Caló equivalent to the "n-word."  Rather, according to Mr. De León, "mayate" in Chicano Caló is comparable to the Spanish term "negro/negra," used as a neutral descriptor for Black people (and sometimes as a term of endearment).

76.    In Chicano Caló, "mayate" is a homonym, which can refer to its literal translation of June bug or beetle,"[29] the color black,[30] or to Black people.  For instance, Chicano poet Alberto Alvaro Ríos (who served as Arizona's first poet laureate in 2013) entitled one of his poems "Mayates," in which he describes a children's game involving a June bug.[31]

77.    Mr. De León used the word "mayates" in the Elegy Poem as a neutral reference to Black people.  He has never used the term with the intent to disrespect, demean, or disparage any group or individual.

---

[29] Mayate is derived from the Aztec Nahuatl word "mayatl," which is defined in Spanish as an "[e]scarabajo alado de color verde" or, in English, a green-winged beetle. *See* Rémi Siméon, *Diccionario de la Lengua Nahuatl o Mexicana*, at 249 (1st ed. 1977).

[30] For example, Mr. De León has overheard orders for "café mayate" (black coffee) in cafés in San Antonio, Texas.

[31] *See* Alberto Alvaro Ríos, *Mayates*, The Norton Anthology of Latino Literature, at 1918-1919 (1st ed. 2011).

78.     It is Mr. De León's position that speakers of Chicano Caló who are familiar with the language's origin and usage would not construe "mayate" as a racial slur, as no such connotation for the word exists in the language.

79.     In his response to Mr. Tejeda, Mr. De León noted the dangers of over-policing Chicano Caló, which Mr. De León believes is a young and nuanced language that has only "recently begun to be used in writing … in the last 50-60 years," and which is still developing. Ex. C.

80.     Prior to the Elegy Poem, in his more than 50 years of publications in poetry, prose, and playwriting, Mr. De León had never once been accused of using racist or otherwise hateful or derogatory speech toward any race or ethnicity.  Indeed, Mr. De León is certain that it is only due to the accumulation and consistency of his accolades over the years, and the public recognition that he has received as a unifying figure in the literary community, that he was selected to serve as the City of San Antonio's Poet Laureate.

81.     Mr. De León believes that Chicano Caló is at risk of being stifled or corrupted by negative stereotypes and interpretations (such as the imputation of racism on the term "mayate") imposed by the predominantly English-speaking American populace—and, in this case, by the City and its Executive Director of the Department of Arts and Culture Ms. Jones who, upon information and belief, speaks neither Spanish nor Chicano Caló.

82.     Mr. De León fears that Chicano Caló is spoken and understood less and less by younger generations of Chicanos who have been discouraged from speaking Caló due to its stigmatization as a low-class, gang-related, or "politically incorrect" language.[32]

---

[32] Researchers have found that indigenous languages spoken by Spanish speakers, such as Nahuatl, have been losing ground in the United States, especially among youth and young adult populations who are increasingly using English as their only or principal language. *See* Elizabeth Brandt, *Spanish: A Language of Indigenous Peoples of the Americas*, *in* Nurturing Native Languages, 129, 134–35 (Jon Reyhner, et al., eds., 2003).  In the United States,

83.     Mr. De León uses Chicano Caló in his poetry in an effort to revive and restore the Chicano language to a place of literary respect, and to weaken the derogatory force of any negative connotations that have been associated with the language.

84.     Mr. De León believes that the loss or stigmatization of Chicano language will gravely impact, if not destroy, Chicano culture.

### IV.     MR. DE LEON'S TERMINATION

85.     On information and belief, the City first learned of Mr. De León's Elegy Poem from two letters that were sent to the Department, urging the City to take action with respect to the poem.[33]

86.     On information and belief, neither letter has been released to the public, and the authors of the letters asked that they remain private.  Mr. De León has seen neither letter.

87.     On Monday, August 14, 2023, Defendant Jones contacted Mr. De León and directed him to speak with her in her office that same day.

88.     Mr. De León complied and reported to Ms. Jones's office where she informed Mr. De León that he had posted a poem on Facebook that was "counter to the City's ethics" because he had used a "racial slur."

89.     Ms. Jones did not specify which poem she was referring to, nor did she inform Mr. De León what particular language had been deemed a "racial slur."

---

minority languages spoken by "conquered" groups—specifically, Spanish and indigenous languages spoken by natives prior to American colonization—are "stigmatized by the majority culture," leading members of such minorities "to have negative attitudes toward themselves, their cultures and the languages they speak." *Id*. at 135 (recommending revitalization and stabilization efforts to revive Spanish and indigenous languages in the United States).

[33] https://paisano-online.com/35557/arts-life/poet-laureate-fired-over-use-of-racial-slur-in-poem/.

90.     Ms. Jones stated to Mr. De León, "I will not waste time and just get to the point," and proceeded to inform Mr. De León that, because he had used a racial slur in a poem on Facebook, his contract as Poet Laureate would be terminated.

91.     Ms. Jones informed Mr. De León that he had two options: resign as Poet Laureate or be terminated.  She then handed him a resignation form that had been prepared for him to sign.

92.     Mr. De León took the resignation form from Ms. Jones and asked how much time he would have to consider his decision.  The answer was "none."  Ms. Jones informed him that he would have to decide right then and there and would receive no additional time to contemplate his course of action.

93.     Mr. De León chose not to resign, and Ms. Jones informed him that he would be terminated as Poet Laureate by the end of the day.

94.     Mr. De León was provided no opportunity to defend himself, to address the allegation that he had used an unspecified racial slur in an unspecified poem, nor to attempt to ameliorate the situation.

95.     On information and belief, Defendants conducted no formal or meaningful investigation into the allegations against Mr. De León, nor into the multiple meanings of the word "mayate," particularly as used in the context of the Elegy Poem in Chicano Caló, prior to terminating Mr. De León.

96.     Later that day, Mr. De León received by email a letter of termination, signed by Ms. Jones.  Ex. D (the "Termination Letter").

97.     The Termination Letter stated that the City's Poet Laureate "serves to promote poetry in compliance with the City's values," which "unite the community, denounce racism, and work to create equitable communities for all [the City's] residents."  *Id.*

21

98.    The Termination Letter informed Mr. De León that he had "recently posted a poem that included a racial slur," which "is contrary to the City's principles and is unbecoming of the City's Poet Laureate." *Id.*

99.    The Termination Letter informed Mr. De León that, as a result of his "unbecoming" action, "in accordance with section 7.2 of the Professional Service [*sic*] Agreement for Poet Laureate, the City is terminating your Agreement." *Id.*

100.    Section 7.2 of the Agreement, "Termination Without Cause," requires 10 calendar days' written notice prior to any termination of the Agreement without cause.

101.    Defendants did not provide Mr. De León with any form of notice prior to termination.

102.    Defendants did not provide Mr. De León with written notice of any failure to perform or failure to comply with the Agreement, nor of any unsatisfactory performance of Mr. De León's services as Poet Laureate.  Nor did Defendants grant Mr. De León 15 calendar days to cure any such default, as required under Section 7.4 of the Agreement.

103.    Defendants notified Mr. De León that the Agreement would be terminated and proceeded to terminate the Agreement all within the same day, following Mr. De León's meeting with Ms. Jones, which lasted no more than five minutes.

104.    Prior to Mr. De León's meeting with Ms. Jones, he had received no notice, warning, or any indication from Defendants that he had done anything wrong, nor that his position as Poet Laureate might be at risk.

105.    Within 24 hours after Mr. De León's termination, the City released a press statement (the "Press Statement"), which announced that Mr. De León had been terminated as Poet

22

Laureate for purportedly posting "a poem contrary to the City's values," which include "denouncing racism among other oppressive barriers."[34]  The Press Statement reads as follows:

> "The City of San Antonio's Department of Arts & Culture is committed to championing policies and practices that empower a just, inclusive, and equitable city which aligns with the City of San Antonio's mission statement and core values.  The City of San Antonio's Poet Laureate is to uphold these values, which include denouncing racism among other oppressive barriers, while using creative poetic expressions to unite our community.  Nephtali De Leon recently posted a poem contrary to the City's values and the role of City Poet Laureate.  As a result, Mr. De Leon's contract with the City of San Antonio has been terminated."[35]

106.    Within 24 hours after Mr. De León's termination, numerous local news and media outlets were reporting on the City's press statement and Mr. De León's termination as Poet Laureate for allegedly using a "racial slur" in a poem.

107.    On August 15, 2023—one day after Mr. De León's termination—*San Antonio Express-News* published an article entitled "San Antonio fires poet laureate for using 'racial slur' in a poem."[36]

108.    According to the article, in an email to City Manager Erik Walsh, Assistant City Manager Lori Houston explained that the City terminated Mr. De León as Poet Laureate because "Mr. De León posted a poem that included a Spanish racial slur."  The purported racial slur was not identified.

109.    Additionally, according to the August 15, 2023 article, San Antonio Mayor Nirenberg stated publicly that he supported the Department's decision to terminate Mr. De León as the City's Poet Laureate.

---

[34] https://foxsanantonio.com/newsletter-daily/san-antonios-poet-laureate-fired-over-racial-slur-in-poem-arts-culture-author-four-months-august-values.

[35] *Id*.

[36] https://www.expressnews.com/entertainment/article/san-antonio-poet-laureate-nephtali-de-leon-fired-18297471.php.

110.    Several local news and media outlets reported that Mr. De León had used a "Spanish" word—frequently, without specifying the particular word—that is derogatory and racist toward Black people.[37]  Some reported that he had also included in his poem a racial slur against White people.[38]

111.    Within one to two weeks after Mr. De León was terminated as Poet Laureate, he visited the office of the San Antonio City clerk, Ms. Debbie Racca-Sittre (the City's former Director of the Department of Arts and Culture), to appeal his termination.  Ms. Racca-Sittre informed Mr. De León that, because he was not an employee of the City, there was nothing that Mr. De León could do about the termination, and no appeal procedures were available to him.

112.    Ms. Racca-Sittre informed Mr. De León that the City could fire outside contractors for any reason or no reason at all, "even if they didn't like the color of her hair."

113.    On June 14, 2024, on behalf of Mr. De León, the undersigned counsel sent Defendants a letter requesting that Defendants immediately retract the Press Statement from any website or other media administrated or controlled by the City of San Antonio.  Ex. E.  The letter also requested that Defendants issue a public apology to Mr. De León and fully disavow the defamatory Press Statement.

114.    On June 21, 2024, counsel for Defendants responded by letter that the City would not retract the Press Statement nor issue a public apology.  Ex. F.

---

[37] *See* https://www.lmtonline.com/news/local/article/san-antonio-poet-laureate-18297735.php; https://www.expressnews.com/entertainment/article/san-antonio-poet-laureate-nephtali-de-leon-fired-18297471.php; https://www.ksat.com/news/local/2023/08/17/previous-san-antonio-poet-laureate-weighs-in-on-controversy-surrounding-current-poet/.

[38] Though the articles do not specify the alleged racial slur, they presumably refer to the term "gavachos," which Mr. De León used in his Elegy Poem as a neutral reference to White people.  The City never informed Mr. De León which word they deemed to be a racial slur in his poem, nor did they specify in their press release following his termination. *See* https://www.ksat.com/news/local/2023/08/17/previous-san-antonio-poet-laureate-weighs-in-on-controversy-surrounding-current-poet/.

24

## V.    IMPACT ON MR. DE LEON

115.    As a result of Defendants' unlawful termination and defamatory statements, Mr. De León has suffered and continues to suffer harm in the form of the violation of his constitutional rights, serious damage to his professional reputation, financial loss, including the remaining $7,000 that he would have earned as Poet Laureate had he served the full three-year term, and the loss of career opportunities and prospects.

116.    Prior to the City's unlawful termination and subsequent defamatory statements to the local press, Mr. De León had a stellar professional reputation—which he had worked to build for over 50 years—as a well-respected, ebullient, and internationally-renowned Chicano poet and writer.  He had never once been accused of using racist, discriminatory, or otherwise derogatory language in any of his works.

117.    As a result of Defendants' actions, when Mr. De León Google searches his own name, the results are dominated by the headlines of news and media outlets referencing his termination as San Antonio Poet Laureate for the use of a "racial slur."

118.    Mr. De León's termination as Poet Laureate—and the very public circulation of the City's defamatory press statement immediately following that termination—have severely harmed Mr. De León's professional reputation as a Chicano poet and writer who has dedicated his life to battling racial injustice, stigmatization, and stereotypes.

119.    Mr. De León fears that his termination only further compounds the suppression and stigmatization of Chicanos in this country, transforming his prior recognition as a respected representative of the Chicano community into something negative and damaging to America's outlook on Chicanos, as a whole.

120.    Because of Defendants' actions, Mr. De León is now viewed within the literary community and among prospective hosts and for prospective honorariums less favorably and as a controversial figure.  As a result, he has suffered, and continues to suffer, financial loss and the loss of professional opportunities and prospects.

121.    One of Mr. De León's primary sources of income is the payment that he receives for his engagement in public events and programs, such as poetry readings, public speaking, student programs for creative writing, as well as lectures and lessons taught at schools, universities, and other cultural and political organizations.  Due to the harm that Mr. De León's reputation has suffered as a result of Defendants' conduct, it is significantly more difficult for Mr. De León to obtain income and gainful employment through such public engagement activities.

122.    Although it is impossible for Mr. De León to ascertain the exact number of potential professional opportunities that he has lost (and will continue to lose) as a result of Defendants' unlawful actions, he is aware of several opportunities that were withdrawn due to the City's defamatory statements.

123.    In February or March of 2023, Mr. De León was contacted by Joe Ochoa of JLO Productions, a special events and marketing company, and engaged to serve as the lead host and presenter of a monthly poetry and arts program for young writers and artists in the San Antonio community, to be called "Coffee, Tea with Nephtali."

124.    Following his engagement, Mr. De León met with JLO Productions over the course of the subsequent six to seven months to help design, script, market, and promote the twelve initial episodes that were planned for the program.

125.    Each episode was to be held and produced at Mi Familia at the Rim, a well-known restaurant and longstanding icon of food and culture in San Antonio.

126. Gemini Ink, a local poetry and writing arts center, agreed to co-sponsor the episode scheduled for August 15, 2023 of "Coffee, Tea with Nephtali."

127. Each show would be open to the public and would also be recorded and available online.

128. At each show, Mr. De León would be permitted to sell his books, prints, and artwork, as well as apparel bearing designs of his artwork. Mr. De León and JLO Productions agreed that, once the show was up and running, they would determine the appropriate payment for Mr. De León's participation.

129. After the City terminated Mr. De León as Poet Laureate on August 14, 2023, Mi Familia requested a meeting with JLO Productions and informed the company that, due to the adverse publicity of Mr. De León concerning his termination, Mi Familia could no longer support Mr. De León, nor offer the use of Mi Familia's property for the production of "Coffee, Tea with Nephtali." Mi Familia informed JLO Productions that it would need to remove Mi Familia as a sponsor from any promotional materials used to market the program.

130. Similarly, on August 14, 2023—just prior to the episode of "Coffee, Tea with Nephtali" scheduled for August 15, 2023—Gemini Ink informed Mr. Ochoa that, due to Mr. De León's termination as Poet Laureate for his purported use of a racial slur, Gemini Ink would no longer participate in the first episode, nor would it offer any future support or endorsement of the program.

131. According to Gemini Ink's Executive Director Alexandra Van de Kamp, Gemini Ink "had to back out of ['Coffee, Tea with Nephtali'] because the situation wasn't resolved" and

due to concerns about Mr. De León's "inability to more fully apologize or address people's concerns about it."[39]

132.    According to Ms. Van de Kamp, Mr. De León's termination was "an educational experience" for her, as she "believes the [Elegy Poem] was written in good spirit."  Ms. Van de Kamp only "grew concerned" about the poem when Anisa Onofre, Gemini Ink's marketing director and the wife of Juan Tejeda, *see supra* at 17, "raised the issue prior to the [August 15, 2023] event."[40]

133.    On March 21, 2023, Mr. De León was invited by Magdalena Yznaga, a professor of Mexican-American studies at Palo Alto College, to be the opening poet of the college's LATINX Heritage Month 2023 event.  Mr. De León would have earned a $500 honorarium for his services.

134.    On August 18, 2023—four days after Mr. De León's termination—Professor Yznaga wrote to inform Mr. De León that, "due to a change of circumstances," Mr. De León's services as opening poet would no longer be needed.

135.    On August 25, 2023, in response to Mr. De León's inquiry regarding the change of circumstances, Professor Yznaga informed him that he had been removed from the program after the LATINX Heritage Month committee and its administrators became aware of Mr. De León's termination as San Antonio Poet Laureate.

136.    On June 21, 2023, San Antonio City Councilman Manny Pelaez verbally invited Mr. De León to give a poetry reading at the 2024 All Americas Summit event to be held on May 28–31, 2024, hosted by Sister Cities International in San Antonio.

---

[39] https://sanantonioreport.org/city-removes-nephtali-de-leon-from-poet-laureate-post-after-4-months-racial-slur/.
[40] *Id.*

28

137.    Since Mr. De León's termination as Poet Laureate, Mr. De León has run into and touched base with Councilman Pelaez on several occasions, but he has never heard back from the Councilman about his prior invitation.

138.    In a letter dated August 18, 2023, Mr. Gabriel Quintero Velasquez, the President and CEO of Avenida Guadalupe Association (a community development organization in San Antonio), informed Mr. De León "with a heavy heart" that, due to his termination as Poet Laureate, Mr. De León could no longer sit at a place of honor as "Parade Grand Marshal" in the "El Dieciseis de Septiembre" parade—a widely celebrated event in San Antonio and elsewhere within the Chicano community.  Ex. G.

139.    According to the letter, "[o]n August 16th, [Mr. Velasquez] received notice from the City of San Antonio's Department of Arts and Culture" that the City had removed Mr. De León's name from the parade agenda "because of a controversy implicating [Mr. De León's] poem titled: *Dr. Roberto 'Cintli' Rodriguez (adiosito carnal)*."  Mr. Velasquez explained that the parade was "co-sponsored by the City of San Antonio's Department of Arts and Culture."  *Id*.

140.    Mr. Velasquez explained that "[he] [did] not share in the inference that [Mr. De León's] work [was] racist or malicious" because he did not believe that Mr. De León's intention was "to exploit someone or some class, or that the purpose of [his] words [was] to insult or to cause harm to someone."  *Id*.

141.    Mr. Velasquez stated in the letter that he had his "own unique interpretation of [Mr. De León's] poem," and that he was "of the opinion that [Mr. De León] is a master of [his] craft," transforming Chicano Caló words "into an empowering lexicon recorded in the contemporary annals of the dispossessed."  Mr. Velasquez wrote to Mr. De León: "You define Chicano.  And I respect you."  *Id*.

142.    Over the years, the League of United Latin American Citizens ("LULAC")—the largest Latino organization in the nation with chapters across the country—has invited Mr. De León to serve as a keynote speaker by both its local chapters and at its national conventions.  Since Mr. De León's termination in August 2023, he has not received a single invitation from LULAC to speak at any of its events.

143.    On September 18, 2023, Dr. John Lin, the President of San Antonio's Taiwan Center for Mandarin Learning (the "TCML"), invited Mr. De León to speak and give a poetry reading at an October 7, 2023 event celebrating Taiwan's National Day and Mid-Autumn Festival. In compensation, Mr. De León would receive $500 in credit for Chinese language courses taught at the TCML.

144.    On September 30, 2023, Dr. Lin informed Mr. De León that he had been removed from the October 7, 2023 event.  Dr. Lin informed Mr. De León that he was compelled to remove Mr. De León from the program because Links Incorporated, an organization scheduled to present at the event, had threatened to cut off financial support for the program if Mr. De León were included among the presenters.

145.    Links Incorporated is a non-profit organization "committed to improving the lives of African-Americans and other members of the African diaspora."[41]

146.    On information and belief, Links Incorporated threatened to cut off financial support for the October 7, 2023 event as a result of Defendants' defamatory statements concerning Mr. De León's purported use of a racial slur, which were widely publicized in the local news and media outlets in San Antonio.

---

[41] https://washingtondclinksinc.org/welcome.

147.    Further, Mr. De León would have earned an additional $7,000 under the Agreement had he served his full term as Poet Laureate.  Due to Defendants' unlawful termination, he has been deprived of that income.

## COUNT ONE
### VIOLATION OF THE FIRST AMENDMENT – RETALIATION
**(42 U.S.C. § 1983)**
**Against Defendant Jones in her official capacity**

148.    Plaintiff incorporates by reference all of the preceding material as though fully set forth herein.

149.    As a general matter, the law is settled that the First Amendment "prohibits government officials from subjecting an individual to retaliatory actions" for exercising free speech. *Hartman v. Moore*, 547 U.S. 250, 256 (2006); *Miles v. Beckworth*, 455 F. App'x 500, 504 (5th Cir. 2011) ("The government may not constitutionally compel persons to relinquish their First Amendment rights as a condition of public employment.").

150.    Recognizing that "constitutional violations may arise from the deterrent, or 'chilling,' effect of governmental [efforts] that fall short of a direct prohibition against the exercise of First Amendment rights," *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 674 (1996), the Supreme Court has repeatedly ruled that the government may not punish an individual or deny him a benefit "on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech." *Perry v. Sindermann*, 408 U.S. 593, 597 (1972) (upholding First Amendment claim alleging public university declined to renew professor's contract in retaliation for exercise of free speech).

151.    While the right to freedom of speech is not absolute, the First Amendment protects government employees and contractors, alike, from termination in retaliation for "their speech on

31

matters of public concern." *Umbehr,* 518 U.S., at 675 (upholding independent contractor's First Amendment retaliation claim against government defendant).

152.    "Speech by citizens on matters of public concern lies at the heart of the First Amendment, which 'was fashioned to assure unfettered interchange of ideas for the bringing about of political and social changes desired by the people.'" *Teague v. Travis Cnty. Emergency Servs. Dist. 8*, No. 1:23-cv-01053, 2024 WL 1978008, at *3 (W.D. Tex. May 3, 2024) (quoting *Lane v. Franks*, 573 U.S. 228, 235–36 (2014)).

153.    Speech addresses a matter of public concern when it relates "to any matter of political, social, or other concern to the community." *Connick v. Myers*, 461 U.S. 138, 146 (1983). The linchpin of the inquiry is the extent to which the speech "advances an idea that transcends personal interest or conveys a message that impacts our social or political lives." *Hiers v. Bd. of Regents of the Univ. of N. Texas Sys.*, No. 4:20-cv-321, 2022 WL 748502, at *6 (E.D. Tex. Mar. 11, 2022) (citing *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 138 S. Ct. 2448, 2476 (2018) (explaining that "controversial subjects" and "sensitive political topics" are "undoubtedly matters of profound value and concern to the public")).

154.    By terminating Mr. De León as Poet Laureate for expressing his positive views concerning Dr. Roberto 'Cintli' Rodriguez—a widely renowned figure in the Chicano community and a long-time friend of Mr. De León—as well as the usage and meaning of Chicano Caló as used in the Elegy Poem, Defendants unconstitutionally retaliated against Mr. De León in violation of his First Amendment rights.

155.    When Mr. De León expressed his views by posting the Elegy Poem on his personal Facebook page, he was not acting in his capacity as Poet Laureate, but speaking as a private citizen

on a matter of public concern about the loss of both a friend and a celebrated Chicano writer and nationally syndicated columnist known for his activism against racial injustice and police brutality.

156.   Mr. De León's interest—as a life-long Chicano writer and activist—in speaking freely in his own authentic language about the impact that a fellow Chicano writer and activist made on both himself and American society, vastly outweighs any interest Defendants have in the efficient provision of public services in this context.

157.   Mr. De León's speech never prevented Defendants from efficiently providing public services.

158.   Defendants' termination of Mr. De León as Poet Laureate in retaliation for his exercise of constitutionally protected speech constitutes an adverse employment action.

159.   Defendants took such unconstitutional and retaliatory actions against Mr. De León because of the views he expressed on Facebook through and related to the Elegy Poem.

160.   Ultimately, for speaking his own language in the respectful context of an elegy dedicated to a major figure in Mr. De León's life and the Chicano community, Defendants unconstitutionally terminated and subsequently defamed Mr. De León without offering him notice or even the barest of opportunities to explain or defend himself.  Defendants have engaged in quintessential retaliation against Mr. De León in violation of the First Amendment.

## COUNT TWO
### VIOLATION OF THE FIRST AMENDMENT – VIEWPOINT DISCRIMINATION
### (42 U.S.C. § 1983)
### Against Defendant Jones in her official capacity

161.   Plaintiff incorporates by reference all of the preceding material as though fully set forth herein.

162.   The First Amendment, incorporated against the States through the Fourteenth Amendment, prohibits the government from punishing individuals for expressing certain

33

viewpoints. *See Ashcroft v. ACLU*, 535 U.S. 564, 573 (2002) ("The First Amendment means that government has no power to restrict expression because of its message, its ideas, its subject matter, or its content.").

163.    "If there is any fixed star in our constitutional constellation, it is that no official, high or petty, can prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion or force citizens to confess by word or act their faith therein." *W. Va. State Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943).

164.    Labeling speech "offensive" or "derogatory" does not strip it of First Amendment protection.  The Supreme Court has "said time and again that 'the public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers.'" *Matal v. Tam*, 528 U.S. 218, 244 (2017) (First Amendment viewpoint discrimination when government prohibited speech that it thought would demean or offend "at least some Asian-Americans").

165.    The danger of viewpoint discrimination is that "the government is attempting to remove certain ideas or perspectives from a broader debate." *Id*. at 250 (Kennedy, J., concurring). And "[t]hat danger is all the greater if the ideas or perspectives are ones a particular audience might think offensive, at least at first hearing," because "[a]n initial reaction may prompt further reflection, leading to a more reasoned, more tolerant position." *Id*.

166.    In a similar vein, the First Amendment protects minority views.  *See Bd. of Regents of Univ. of Wis. Sys. v. Southworth*, 529 U.S. 217, 235 (2000) ("The whole theory of viewpoint neutrality is that minority views are treated with the same respect as are majority views.").

167.    A speaker's particular use of language "reflects a viewpoint about when and how such language should be used." *Wandering Dago, Inc. v. Destito*, 879 F.3d 20, 31, 33 (2d Cir.

2018) (government could not prohibit speech it deemed an "ethnic slur" that it characterized as "offensive" and not "family friendly") (citing *Matal v. Tam*, 582 U.S. 218 (2017)).

168.    By punishing Mr. De León for his particular use of Chicano Caló—a language that he has spoken fluently for decades—in the Elegy Poem, Defendants have engaged in quintessential, unlawful content- and viewpoint-based discrimination in violation of the First Amendment.

169.    Mr. De León's use of Chicano Caló in the Elegy Poem expressed his viewpoint on the meaning and value of Caló, including "when and how such language should be used." *Id*.

170.    Defendants breached the terms of the Agreement and terminated Mr. De León as Poet Laureate solely on the basis of the content and viewpoint that Mr. De León expressed in the Elegy Poem.

171.    The First Amendment protects Mr. De León's views on Chicano Caló, including its historical development and contemporary usage.

172.    In sum, Defendants' retaliatory and unconstitutional actions against Mr. De León constitute viewpoint discrimination and violate Mr. De León's right to speak freely under the First Amendment—whether in English, Spanish, or Chicano Caló.

## COUNT THREE
### DEFAMATION
### Against all Defendants
### (Including Defendant Jones in both her individual and official capacities)

173.    Plaintiff incorporates by reference all of the preceding material as though fully set forth herein.

174.    A statement is considered defamatory under Texas law "if it tends to injure a person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial

35

injury or to impeach any person's honesty, integrity, virtue, or reputation." *Parker v. Spotify USA, Inc.*, 569 F. Supp. 3d 519, 528 (W.D. Tex. 2021) (cleaned up).

175.    Defendants' public statements concerning Mr. De León's termination as Poet Laureate for his purported use of a racial slur gravely injured and impeached Mr. De León's reputation and integrity, and exposed him to public contempt, hatred, and financial injury.

176.    Within 24 hours following Plaintiff Mr. De León's termination as Poet Laureate, Defendants released the following press statement:

> "The City of San Antonio's Department of Arts & Culture is committed to championing policies and practices that empower a just, inclusive, and equitable city which aligns with the City of San Antonio's mission statement and core values. The City of San Antonio's Poet Laureate is to uphold these values, which include denouncing racism among other oppressive barriers, while using creative poetic expressions to unite our community. Nephtali De Leon recently posted a poem contrary to the City's values and the role of City Poet Laureate. As a result, Mr. De Leon's contract with the City of San Antonio has been terminated."[42]

177.    The City's press statement strongly implied that Mr. De León posted a poem counter to the City's value of "denouncing racism."

178.    The implication that Mr. De León was terminated as Poet Laureate for posting a poem counter to the City's value of "denouncing racism" is among the implications that an objectively reasonable reader would draw from the City's press statement.

179.    On information and belief, Defendants made additional defamatory statements to local news outlets concerning Mr. De León's termination and the circumstances thereof, including sharing with the *San Antonio Express-News* an email from Assistant City Manager Lori Houston to City Manager Erik Walsh, in which Ms. Houston explained that the City terminated Mr. De León as Poet Laureate because "Mr. De León posted a poem that included a Spanish racial slur."[43]

---

[42] *Supra* at n.34.

[43] *See supra* n.36 (quoting email of Lori Houston to Erik Walsh).

180. As a direct and proximate result of Defendants' statements, numerous local news and media outlets reported that Mr. De León was terminated as Poet Laureate for using a racial slur in one of his poems.

181. Several local news and media outlets reported that Mr. De León had used the Spanish equivalent of the "n-word."

182. Defendants' statements to third-party news and media outlets were false because Mr. De León did not use a "Spanish racial slur" in the Elegy Poem (nor in any other poem), and because Mr. De León's Elegy Poem cannot be reasonably construed as being counter to the value of "denouncing racism."  The word in question is not even a Spanish word.

183. Defendants acted in a negligent manner (or worse) concerning the truth or falsity of these statements.

184. Defendants knew of or recklessly disregarded the falsity of these statements, acted without due regard and in a grossly irresponsible manner, and acted negligently when they made the statements because Defendants failed to adequately investigate the allegations that Mr. De León had used a racial slur in a poem; failed to adequately investigate the meaning or meanings of "mayate" in Chicano Caló; and failed to provide Mr. De León with a meaningful opportunity to defend himself or address any allegations concerning the Elegy Poem prior to the publication of Defendants' defamatory statements.

185. Defendants' statements were defamatory *per se* because they tended to injure Plaintiff Mr. De León in his business, profession, and calling.

186. Defendants' statements were also defamatory *per se* because they were so obviously detrimental to Mr. De León's good name that general damages may be presumed, including loss of reputation and professional opportunities, and mental anguish.

37

187. As a direct and proximate result of the conduct described above, Plaintiff Mr. De León sustained damages, including without limitation severe reputational damages, past and future economic losses, emotional distress, and the loss of career opportunities and prospects. Plaintiff is thus entitled to damages in an amount to be determined at trial.

## COUNT FOUR
### BREACH OF CONTRACT
### Against all Defendants

188. Plaintiff incorporates by reference all of the preceding material as though fully set forth herein.

189. Under Texas law, "a contract must address all of its essential and material terms with 'a reasonable degree of certainty and definiteness.'" *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) (quoting *Pace Corp. v. Jackson*, 155 Tex. 179, 284 S.W.2d 340, 345 (1955)). Essential terms in the context of employment agreements typically include "compensation, duties, and responsibilities." *Hiers*, 2022 WL 748502, at *21 (citing *City of Houston v. Williams*, 353 S.W.3d 128, 139 (Tex. 2011)).

190. The Agreement constituted a contract between Plaintiff Mr. De León and Defendants.

191. Defendants breached that contract by terminating Mr. De León as Poet Laureate in contravention of Mr. De León's First Amendment rights and the terms of the Agreement.

192. According to the Termination Letter, Defendants terminated Mr. De León's contract with the City pursuant to Section 7.2 of the Agreement. Section 7.2, however, requires that the terminating party provide 10 calendar days' written notice prior to termination.

193. Defendants failed to provide Mr. De León with any notice.

194. The Agreement also provides that, if Mr. De León were to default in his performance of the Agreement, the City would be required to provide Mr. De León with written

38

notice of the default and to allow him 15 calendar days following receipt of such notice to cure the specified default.

195.    Defendants failed to provide Mr. De León with any notice of default, nor any opportunity to cure such default.

196.    Plaintiff has suffered and continues to suffer foreseeable harm from this breach.

197.    As a result of Defendants' breach, Mr. De León has sustained damages, including without limitation the additional $7,000 in compensation that Plaintiff would have earned had he served his full term as Poet Laureate, as well as reputational damages as discussed in Count Three, and the loss of prospective career opportunities and prospects.

## **PRAYER FOR RELIEF**

Plaintiff Mr. De León respectfully requests that the Court enter judgment in his favor and grant the following relief:

A.    A declaratory judgment that Defendant Jones's retaliatory actions violated Mr. De León's right to free speech under the First Amendment of the United States Constitution;

B.    A declaratory judgment that: (i) Defendants defamed Mr. De León; (ii) Defendants should retract the Press Statement and any additional defamatory statements related to Mr. De León's termination from any website or media administrated or controlled by Defendants; and that (iii) Mr. De León's reputation should be restored;

C.    A declaratory judgment that Defendants committed a breach of contract by terminating Mr. De León in violation of the terms of the Agreement;

D.    An injunction enjoining Defendants from denying Mr. De León any future position as City Poet Laureate, should he be nominated and selected by the selection committee,

and from otherwise taking adverse actions against Mr. De León on the basis of the Elegy Poem and/or his views expressed therein;

E.      A judgment awarding Mr. De León the additional $7,000 in compensation that he would have earned serving his full term as Poet Laureate had Defendants not breached the terms of the Agreement and unconstitutionally terminated Mr. De León;

F.      A judgment awarding Mr. De León damages for defamation to be determined at trial, including, without limitation, damages to reputation, past and future economic losses, and loss of career opportunities or prospects;

G.      An award of attorney's fees pursuant to 42 U.S.C. § 1988;

H.      Nominal damages of $1 for Defendants' constitutional violations;

I.      Applicable interest on any monetary award;

J.      Any other relief that the Court may deem just and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

August 2, 2024

Respectfully submitted.

/s/ Margaret A. Little
Margaret A. Little
Casey Norman*
Jenin Younes**
Margaret A. Little (Bar #: 3034494)
NEW CIVIL LIBERTIES ALLIANCE
1225 19th Street NW, Suite 450
Washington, DC 20036
Telephone: (202) 869-5210
Facsimile: (202) 869-5238
*Application for admission pending
**Pro Hac Vice motion forthcoming

Attorneys for Plaintiff

40