## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

NEPHTALI DE LEÓN,             :
*Plaintiff*,                   :

          v.             :          No. 5:24-cv-00849-XR

CITY OF SAN ANTONIO, TEXAS,   :
KRYSTAL JONES,            :
*Defendants*.               :

### PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANTS' PARTIAL MOTION TO DISMISS

      This case exemplifies the harm done to Americans' freedom of speech and creative expression when government actors favor cancel culture over the First Amendment, and when the perceived risk of offense is prioritized over the marketplace of ideas.  The end result is that minority viewpoints are suppressed, and creativity stifled.  Such conditions are anathema to the core principles upon which this nation was founded—yet they present themselves starkly in this case.  Plaintiff Nephtalí De León was terminated from his position as the City of San Antonio's Poet Laureate, solely on the basis of his use of a single word in Chicano Caló—a language with which, by all indications, Defendants are unfamiliar[1]— in the respectful context of an elegy that he posted on his personal Facebook page, written in honor of a fellow Chicano activist who had dedicated his career to fighting racial injustice.  Neither governmental nor qualified immunity shield Defendants from liability for their unconstitutional and defamatory actions, in clear violation of Mr. De León's fundamental rights.

      Defendants' Motion to Dismiss is predicated on several erroneous assertions that mischaracterize both the factual and legal landscape of this action.  First, Defendants incorrectly

---

[1] In addition to Defendants' erroneous characterization of Mr. De León's use of the word "mayates" in the context of his elegy as racially derogatory, Defendants also inaccurately refer to Chicano Caló as "Canó" throughout their Motion to Dismiss.  ECF No. 14.

contend that a municipal entity's acts carried out in executing "proprietary functions" under the Texas Tort Claims Act (TTCA) cannot also constitute "state action" under 42 U.S.C. § 1983 in the context of a federal constitutional claim.  This argument turns a blind eye to the separate and distinct purposes that the TTCA and § 1983 serve, as well as the fact that § 1983 exists independent of any state remedy.  It also ignores the plain meaning of the text of the respective statutes, which makes clear that whether a municipality's actions were "proprietary" or "governmental" in the context of state tort claims has no bearing on the separate question of a municipality's liability for constitutional or federal violations under § 1983.

Second, the government speech doctrine does not shield Defendant Jones from liability. Mr. De León was not speaking on behalf of the City when he posted an elegy on his personal Facebook account—making zero reference to the City or to the Poet Laureate position—in honor of his friend and renowned Chicano activist Dr. Roberto 'Cintli' Rodriguez.  Nor did the City have any role in selecting or dictating the actual content of or viewpoint expressed in Mr. De León's speech who, pursuant to the terms of the Poet Laureate contract, would retain "exclusive control of and exclusive right to control the details of the work performed" under the contract (*i.e.*, his poetry), as an independent contractor.  ECF No. 10-1 at 8 (Art. XII).  Moreover, the "government speech" doctrine does not mean that state actors can use the weight of their office to unlawfully censor citizens.  *See NRA v. Vullo*, 602 U.S. 175, 188 (2024) ("A government official can share her views freely and criticize particular beliefs, and she can do so forcefully in the hopes of persuading others to follow her lead. In doing so, she can rely on the merits and force of her ideas, the strength of her convictions, and her ability to inspire others. What she cannot do, however, is use the power of the State to punish or suppress disfavored expression.").

Third, Defendant Jones is not entitled to qualified immunity.  The law regarding retaliation against both public employees and independent contractors for the exercise of protected speech is clearly established. Government officials cannot terminate or penalize individuals for speech that addresses matters of public concern, which the Supreme Court has described as speech relating to "any matter of political, social, or other concern to the community," as opposed to speech relating to a personal employment dispute or grievance.  *Connick v. Myers*, 461 U.S. 138, 146 (1983). Defendant Jones had "fair warning" that terminating Mr. De León as Poet Laureate—with no notice, opportunity to cure, or reasonable investigation, and in plain breach of the terms of the Poet Laureate contract—for expressing his views of public concern, including with respect to a widely renowned Chicano journalist and activist against racial injustice, would constitute a violation of Mr. De León's First Amendment rights.

Fourth, the City's defamatory statements concerning Mr. De León were made in connection with the operation and administration of the City's Poet Laureate program, a non-essential, proprietary function.  As opposed to a "governmental" function, as defined by the TTCA, the Poet Laureate program was operated by the City, in its sole discretion, primarily for the benefit of its own residents, rather than for the State's public at large.  Accordingly, Defendants are not immunized from liability under the TTCA.

Fifth, Defendants contend that Mr. De León's defamation claim fails because Mr. De León did, in fact, use the word "mayate" in his elegy (which Defendants incorrectly characterize as a universally offensive racial slur, regardless of speaker, community, or context).  However, Defendants' argument that "[i]f a statement is true, it is not defamatory," ECF No. 14, ¶ 37, oversimplifies the relevant analysis and fails to address the doctrine of defamation by implication, under which defendants may be held liable for statements that are "literally or substantially true,"

but that fail to put the facts into the proper context and, thus, "create a substantially false [or] defamatory impression" or "gist." *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 627 (Tex. 2018). Mr. De León has adequately pled that Defendants' misrepresentation of his speech as racist and derogatory raised a false and defamatory implication.

## ARGUMENT

**I.    Plaintiff Has Established Plausible First Amendment Claims[2]**

*A.    42 U.S.C. § 1983 is applicable to Defendant Jones's unconstitutional conduct in violation of Mr. De León's First Amendment rights*

Whether the City's Poet Laureate program is a "proprietary" or "governmental" function with respect to a tort claim governed by Texas state law is irrelevant to the question of Defendants' liability under § 1983 for constitutional violations committed "under color of [state law]" in connection with Defendants' operation of the Poet Laureate program. Defendants erroneously contend that a municipal entity's acts executed in furtherance of a "proprietary function" in the context of a state tort claim cannot also constitute "state action" under § 1983 in the context of a federal constitutional claim. The two, however, are not mutually exclusive. Indeed, the governmental-proprietary distinction under the TTCA pertains exclusively to tort claims under Texas law and has no bearing on whether Defendant Jones's retaliation against Mr. De León for the exercise of his First Amendment rights qualifies as "under color of [state law]" for purposes of liability under § 1983. *See Tooke v. City of Mexia*, 197 S.W.3d 325, 343 (Tex. 2006). Defendants incorrectly equate "state action" in the broad constitutional context of § 1983 with "governmental

---

[2] Plaintiff did not bring a Fourteenth Amendment due process claim against Defendants and, thus, addresses only Defendants' arguments concerning Plaintiff's First Amendment claims here. In doing so, Plaintiff neither admits to nor concedes the accuracy of any of Defendants' Fourteenth Amendment arguments. Plaintiff references the Fourteenth Amendment in Count One (First Amendment Retaliation) and Count Two (First Amendment Viewpoint Discrimination) of the Amended Complaint because the First Amendment is incorporated against the States through the Fourteenth Amendment. *See* ECF No. 10, ¶ 165 ("The First Amendment, incorporated against the States through the Fourteenth Amendment…").

functions" in the far narrower and distinct context of tort claims encompassed by the TTCA. Tellingly, Defendants cite no case precedent or statutory text in support of this faulty proposition (nor could they).

Defendants correctly point out that, to demonstrate state action for purposes of § 1983, a plaintiff must allege facts showing exercise of a power "'possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law.'" ECF No. 14, ¶ 7 (citation omitted). Indeed, as municipal entities, Defendants' exercise of their respective powers and authority is solely by virtue of state law—regardless of whether the power pertains to a "governmental" or "proprietary" function in connection with tort liability. *See* V. T. C. A., Tex. Local Gov't Code, Chapter 51 ("General Powers of Municipalities"). Whether the Poet Laureate program is "governmental" or "proprietary" for purposes of state tort liability does not alter the fact that, under Texas law, municipalities are inherently governmental "creatures of law" that are "created as political subdivisions of the state … for the exercise of such powers as are conferred upon them" and that "possess only such powers and privileges as have been expressly or impliedly conferred upon them," deriving their authority entirely from the state. *Fanning v. City of Shavano Park, Texas*, 2023 WL 2531737, at *6 (W.D. Tex. Mar. 14, 2023) (alteration in original) (citation omitted). Further, the Supreme Court has made eminently clear that municipal defendants are subject to liability under § 1983 and that actions taken pursuant to a municipal ordinance are made "under color of [state law]" sufficient to trigger potential liability. *See Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690–92 (1978).

While a state's immunity is "inherent in its sovereignty," municipalities, on the other hand, "derive their immunity from the state," and thus "a city's immunity can extend as far as the state's immunity but no further." *Wasson Ints., Ltd. v. City of Jacksonville*, 489 S.W.3d 427, 436 (Tex.

5

2016) (*Wasson I*) ("a city is cloaked in the state's immunity … *only* when it acts as a branch of the state.").

At common law, courts at times struggled to determine a municipality's liability.[3]  The TTCA thus sought to more clearly define governmental functions and thereby limit the liability of municipalities for tort claims.[4]  Congress enacted § 1983, on the other hand, as a means of expanding liability and providing individuals with a cause of action for damages against "state actors" who used "the badge of their authority to deprive individuals of their federally guaranteed rights." *Wyatt v. Cole*, 504 U.S. 158, 161 (1992).  The history of the Act is "replete with statements indicating that Congress thought it was creating a remedy as broad as the protection that the Fourteenth Amendment affords the individual." *Lugar v. Edmondson Oil Co*., 457 U.S. 922, 934 (1982) (citation omitted).  *See also* 42 U.S.C. § 1983 (providing a broad cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory" deprives an individual of their constitutional or federal rights, privileges or immunities).

In short, the governmental-proprietary dichotomy referred to in the context of the TTCA does not decide whether a municipality has acted "under color of [state law]" for purposes of § 1983 liability, but instead whether sovereign immunity is available to a municipality.  When a city functions as a city, rather than as an "arm of the Sovereign," it may be stripped of sovereign immunity, but it nonetheless retains its governmental nature.

In a contrived effort to insulate themselves from liability under both § 1983 and the TTCA, Defendants rely on flatly inconsistent arguments and contradict themselves within the same

---

[3] Laura Mueller, *Texas Tort Claims Act Basics*, at 1
(https://www.tml.org/DocumentCenter/View/329/Texas-Tort-Claims-Act-PDF).
[4] *Id*.

motion.  On the one hand, Defendants argue that Mr. De León's First Amendment claims under §

1983 fail because, with respect to his defamation claim, he "explicitly allege[d] that he was injured

by proprietary, private action,"[5] ECF No. 14, ¶ 6—namely, action arising in Defendants' operation

and management of the Poet Laureate program.  And, according to Defendants, proprietary action

in the state tort context cannot constitute state action for purposes of § 1983 liability.  On the other

hand, Defendants argue just the opposite: that Mr. De León's defamation claim fails because

Defendants' actions relating to the Poet Laureate program were, in fact, "governmental" and thus

warrant governmental immunity under the TTCA.  Defendants cannot have their tort and eat it too.

In any event, Defendants' characterization of the Poet Laureate program as a "private, proprietary

endeavor" that lies outside of § 1983's reach is squarely defeated by Defendants' own express

admissions to the contrary.  *See* ECF No. 14, ¶ 25 ("Decisions concerning the Poet Laureate

program are the City's government speech."), ¶ 35 ("Having a poet laureate is governmental

because governments have poets laureate."), and ¶ 36 ("The City actions alleged by De León

against the Defendants are governmental.").

### B.  *The government speech doctrine does not apply to Mr. De León's speech*

The government speech doctrine does not shield Defendant Jones from liability in this case.

According to Defendants, the government speech doctrine is applicable to Mr. De León's elegy

because the City's authority to select a Poet Laureate and review the Poet Laureate's work

performed under the contract are valid matters of discretion, which do not offend the First

Amendment.  ECF No. 14 ¶¶ 19, 23.  Mr. De León has not argued otherwise, nor does he argue

that the government may not promote its own views and communicate its own messages.

---

[5] First, Mr. De León never characterized Defendants' actions as "private."  *See* ECF No. 10.  ¶¶
42, 182 (describing Defendants' actions as "proprietary functions" that are "discretionary" and
"non-essential").

However, as the Supreme Court recently emphasized, to prevent the government speech doctrine from "being used as a cover for censorship," courts must focus on "whether the government is actually expressing its own views or the real speaker is a private party and the government is surreptitiously engaged in the 'regulation of private speech.'" *Shurtleff v. City of Boston*, 596 U.S. 243, 263 (2022) (Alito, J., concurring in the judgment) (quoting *Pleasant Grove City v. Summum*, 555 U.S. 460, 467 (2009)). The question at issue here is not whether Defendants are authorized to manage the Poet Laureate program or make discretionary decisions in furtherance of that function, but whether the *real speaker* of Mr. De León's elegy, which he posted on his personal Facebook page and dedicated to a long-time friend and renowned member of the Chicano community, was Mr. De León or the City. Moreover, as the Supreme Court explained in *Vullo* earlier this year, the government speech doctrine is curtailed by the First Amendment. Put otherwise, government cannot wield the defense that its merely expressing its own views to censor Americans. *See Vullo*, 602 U.S. at 188. Mr. De León has more than sufficiently pled that his creative speech written in his personal capacity was, in fact, his own and that the City did not dictate, control, or even influence the content or viewpoint expressed in the elegy.

In *Shurtleff*, the Supreme Court concluded that, to assess whether speech is governmental, courts must look to "context rather than the rote application of rigid factors" and, in doing so, must "conduct a holistic inquiry designed to determine whether the government intends to speak for itself or to regulate private expression." *Shurtleff*, 596 U.S. at 252. The Court examined the factors that had traditionally guided its analysis in prior cases (*i.e.*, (1) the history of the speech at issue; (2) the public's likely perception as to whether the government or a private person is speaking; and (3) the extent to which the government has actively shaped or controlled the speech). Nevertheless, despite the fact the Court's conclusion that two of the three factors—history and public

perception—favored the City, the Court ruled that the speech at issue (flag displays during City flag-raising events in front of the City Hall's entrance) did not qualify as government speech. *Id*. at 258.

Key to the majority's analysis was the extent to which the City "actively controlled" and "shaped" the speech conveyed at the flag raisings. *Id*. at 256. The majority concluded that the facts of the case were closest to *Matal v. Tam*, in which the Court concluded that speech conveyed through trademarks generated and proposed by private parties did not constitute government speech. That was so notwithstanding the Patent and Trademark Office's power to review and approve or reject each proposed mark, because the PTO "did not exercise sufficient control over the nature and content of those marks to convey a governmental message in so doing." *Id*. at 253 (citing *Matal v. Tam*, 582 U.S. 218 (2017)). Similarly, the *Shurtleff* majority concluded that the City's authority to review and approve applications for flag-raising events in front of the City Hall did not constitute the requisite "meaningful involvement" in the actual selection and control of the speech to be expressed—despite the extensive historical practice of flag flying at government buildings and despite the Court's finding that the public would likely "see the flags as conveying some message on the government's behalf." *Id*. at 255–56, 258 (citation and internal quotations omitted).

The Court distinguished the case from its other most relevant precedents, *Walker v. Tex. Div., Sons of Confederate Veterans, Inc*., 576 U.S. 200 (2015) and *Summum*, 555 U.S. at 464–68, on which Defendants rely (to no avail) as support for the proposition that Mr. De León's elegy on his Facebook page qualifies as government speech. In *Walker*, the Court concluded that Texas license plate designs proposed by private groups amounted to government speech because the Texas government "actively" maintained "direct control" over every facet of the messages

conveyed and served as the sole decisionmaker on whether any given license plate—which, the Court found, constituted "government-mandated, government-controlled, and government-issued IDs" bearing "TEXAS" in large letters—would be issued or not.  *Walker*, 576 U.S. at 213-14. Similarly, the *Summum* Court held that privately funded and donated monuments constituted government speech where (i) the monuments would be permanently installed in a public park, (ii) the government was the sole decisionmaker as to which monuments it wanted "to display for the purpose of presenting the image of the City that it wishe[d] to project to all who frequent the Park," and (iii) the government took full ownership of each monument on display, as all rights previously possessed by a monument's donor had been relinquished.  *Summum*, 555 U.S. at 473.

The distinguishing factors between *Shurtleff* on the one hand and *Walker* and *Summum* on the other are equally relevant to this case.   Similar to *Shurtleff* and in contrast with *Walker*/*Summum*, Defendants *could*, but were not required to, review Mr. De León poetry and other work carried out in his performance of his Poet Laureate duties.  And if Defendants were to deem some aspect of his work unsatisfactory, the Poet Laureate contract required that, prior to termination, Defendants were obligated to notify Mr. De León of the problem and provide him the opportunity to cure any default in his performance.  ECF No. 10-1 at 4.  *See also Book People, Inc. v. Wong*, 91 F.4th 318, 327 (5th Cir. 2024) (no government speech where agency could, but was not required to, review speech and could notify the private speakers that a correction was required—but otherwise no involvement or influence over speech's actual content).  That is the full and limited extent of Defendants' "involvement in" or "control over" any of the particular content of or messages expressed in Mr. De León's Poet Laureate-related work—not to mention the poetry written in Mr. De León's personal capacity, such as the elegy, over which Defendants maintained zero control or influence.

Neither the City nor Ms. Jones dictated or controlled any of the language, themes, or viewpoints expressed in Mr. De León's poetry, which is perhaps unsurprising given that the exercise of unbounded creative expression and innovative use of language is the role of a poet, not a municipal official.  Indeed, unlike *Walker*/*Summum* (and even *Shurtleff*), Mr. De León's speech did not require government pre-review and selection or approval before sharing or expressing his poetry (*Walker*: government was sole issuer of state license plates and sole decisionmaker as to whether a plate would be approved for issuance; *Summum*: government was sole decisionmaker as to which monuments would be permanently installed in public park and possessed sole ownership rights of each monument on display; *Shurtleff*: government approval required before flag-raising event could be held).  Nor does the City's Non-Discrimination Policy or its inclusion in the Poet Laureate contract somehow transform Mr. De León's personal elegy into government speech.  *See Shurtleff*, 596 U.S. at 274 (Alito, J., concurring in the judgment) (City's written policy specifying that City would not "display flags deemed to be inappropriate or offensive in nature or those supporting discrimination, prejudice, or religious" viewpoints did not identify a message that the City intended to express); *see also id.* at 275 (describing City's argument that its written policy rendered the flag-raising events government speech as a "transparent attempt to reverse engineer a governmental message from facts about the flag raisings that occurred").

Defendants also appear to—erroneously—suggest "ownership" of Mr. De León's speech, whether it was expressed in his capacity as Poet Laureate or in his personal capacity from home in a poem posted on Facebook.  Defendants assert that, by signing the Poet Laureate contract, Mr. De León "licensed his entire body of poetry, all of it written volitionally, for himself, in his individual capacity as a person free to write whatever he felt like writing, to the City, perpetually," ECF No. 14 ¶ 18, and, apparently as a result, forfeited his First Amendment rights.  Defendants'

description of the Poet Laureate contract—and the rights that Mr. De León purportedly relinquished by signing it—suggests something more akin to a deal with the devil, than a professional services agreement.  Indeed, it is Defendants' apparent belief that, by agreeing to serve as Poet Laureate for three years, Mr. De León unwittingly signed away to the City his voice, viewpoints, autonomy over creative expression, and First Amendment free speech rights.  It is also apparently Defendants' view that, because Defendants appointed Mr. De León as Poet Laureate on the basis of protected speech (*i.e.*, the views and content expressed through his history of creative works), they were also permitted to unconstitutionally terminate him on the same grounds, *i.e.*, the content of and viewpoints expressed in any poetry that "*he chose* to write."  ECF No. 14, ¶ 18.  That is not how the First Amendment works.  It is also entirely at odds with the contractual language, stating exactly the opposite.  *See* ECF 10-1 at 8 (Art. XII) (specifying that, as an "independent contractor," Mr. De León would retain "exclusive control of and exclusive right to control the details of the work performed" under the contract (*i.e.*, his poetry)).  *Id.*

Defendants attempt to justify and reframe Defendant Jones's constitutional violations as "acts of editorial discretion that [do] not offend the First Amendment."  ECF No. 14, ¶ 22.  Yet Defendants fail to address the actual *speech* at issue (Mr. De León's elegy or, more broadly, Mr. De León's poetry while he served as Poet Laureate).  The City's power to select and review the performance of the acting Poet Laureate—which Defendants purport authorizes their First Amendment violations—have no meaningful bearing on the extent (if any) to which Mr. De León's poetry was, in fact, a conduit through which the City purposefully conveyed its own messages, rather than Mr. De León's autonomous creative expression and viewpoints. *See Shurtleff*, 596 U.S. at 268 (Alito, J., concurring in the judgment) (cleaned up) (speech requires the "purposeful communication of the speaker's own message," thus, to constitute government speech, "the

government must set the overall message to be communicated through official action."). Moreover, "final approval authority" cannot, alone, "distinguish government speech from censorship of private speech, and analyzing that factor in isolation from speaker identity flattens the distinction between government speech and speech tolerated by the censor." *Id*. at 264.

Likewise, Defendants' unsupported assertion that Defendant Jones did not commit unconstitutional retaliation against Mr. De León when she terminated him as Poet Laureate because the "contract associating De León—and his expression—with the City of San Antonio was governmental expression" is equally unavailing. Defendants cite no support for this dubious proposition, and Plaintiff is aware of none. The dearth of support is not particularly surprising given that, if Defendants' contention were taken to its logical conclusion, a government employer could simply sidestep liability for every claim of First Amendment retaliation by arguing that the employment contract was simply government speech and that unconstitutional termination and other adverse employment conditions were mere expressions of the government's viewpoints and associational preferences.

Mr. De León was not speaking on behalf of the City when he posted an elegy in honor of a friend and fellow Chicano activist on his personal Facebook account. Mr. De León's use of the Chicano Caló term "mayates," in context, reflects an unambiguously neutral reference that, to any objective and reasonable reader, is quite plainly free of discriminatory or racist connotation. Indeed, Mr. De León's elegy celebrates the life of a renowned journalist who dedicated his career to fighting, of all things, racial injustice. Defendants' unwillingness to acknowledge context, evident lack of familiarity with Chicano Caló, and reliance on a mischaracterization cannot serve to justify Plaintiff's termination in retaliation for the exercise of his own—not the City's—speech.

Although the City was certainly entitled to appoint a Poet Laureate and enter into a contract with Mr. De León concerning the terms of the Poet Laureate position, the government speech doctrine does not justify Ms. Jones's retaliation against Mr. De León for the expression of speech that was purely his own, made using his personal social media account. Nor does it pertain to or immunize the City from liability for its violation of the express terms of the Poet Laureate contract, which specifies that Mr. De León was never an officer nor employee of the City, but rather an independent contractor who would retain "exclusive control of and exclusive right to control the details of the work performed" under the contract (*i.e.*, his poetry).

C. *Defendant Jones violated Mr. De León's clearly established First Amendment rights and thus is not shielded by qualified immunity*

Controlling Supreme Court precedent unambiguously establishes that Defendant Jones's unconstitutional actions—terminating Mr. De León in retaliation for engaging in protected speech—is unconstitutional. The case law is clear: government officials cannot terminate or penalize independent contractors for exercising speech that addresses matters of public concern, as Mr. De León's elegy concerning renowned Chicano journalist and activist Dr. Roberto 'Cintli' Rodriguez undeniably does. Furthermore, qualified immunity is not applicable to Mr. De León's requests for injunctive relief. *See, e.g.*, *Pearson v. Callahan*, 555 U.S. 223, 242 (2009) (qualified immunity is not an available defense in § 1983 cases "where injunctive relief is sought instead of or in addition to damages").

To defeat qualified immunity, a plaintiff must show that: (1) the official violated a statutory or constitutional right; and (2) the asserted right was "clearly established" at the time of the challenged conduct. *Anderson v. Valdez*, 845 F.3d 580, 600 (5th Cir. 2016). At the motion to dismiss stage, "the facts alleged must be taken in the light most favorable to the party asserting the injury." *Id*. (internal quotations omitted).

Defendants contend that Plaintiff has failed to satisfy the "clearly established" prong of the qualified immunity doctrine because Defendants could identify only one other case that raised substantially identical facts and legal arguments: *Baraka v. McGreevey*, 481 F.3d 187 (3d Cir. 2007) (former state poet laureate brought § 1983 action against state officials, alleging First Amendment retaliation after defendants terminated his position in response to poem and withheld $10,000 poet laureate honorarium).[6]  Counter to Defendants' insinuations otherwise, however, the "clearly established" standard does not demand such exacting specificity, nor does it mean that an official's conduct is protected by qualified immunity unless "the very action in question has previously been held unlawful." *Kinney v. Weaver*, 367 F.3d 337, 350 (5th Cir. 2004) (citing *Anderson v. Creighton,* 483 U.S. 635, 640 (1987)).

Indeed, the Supreme Court expressly rejected the practice of defining "clearly established" law in such a way that qualified immunity is mandated unless the facts of case precedent are "materially similar" to the conduct being challenged.  *Hope v. Pelzer*, 536 U.S. 730, 740 (2002) (the law may be clearly established "despite notable factual distinctions between the precedents relied on and the cases then before the Court," so long as the precedents provide "fair warning" that the conduct at issue violated constitutional rights).  Moreover, government officials "can still be on notice that their conduct violates established law [even] in novel factual circumstances." *Safford Unified Sch. Dist. No. 1 v. Redding*, 557 U.S. 364, 377-378 (2009) (quoting *Hope*, 536

---

[6] As Defendants point out, *Baraka* is out-of-Circuit and thus not binding.  Additionally, *Baraka* is readily distinguishable from this action.  In *Baraka*, the plaintiff's claims were dismissed on grounds wholly inapplicable to this case.  Because the plaintiff sued state officials (some of whom operated in the state legislative sphere), rather than municipal ones, the court held that his claims were barred by sovereign and/or legislative immunity.  *Id*. at 195-96.  Further, unlike this case, the plaintiff's poet laureate position was created (and terminated) by New Jersey legislation, which, the court held, created no contractual obligation that could give rise to a breach or property interest.  *Id*. 205-208.

U.S. at 741).  Even general statements of law are, in some circumstances, capable of giving fair warning, and in other instances, "a general constitutional rule already identified in the decisional law may apply with obvious clarity to the specific conduct in question, even though 'the very action in question has [not] previously been held unlawful.'" *Hope*, 536 U.S. at 741 (citing *Anderson*, 483 U.S. at 640).

In *Sause v. Bauer*, for example, the Supreme Court reversed the Tenth Circuit's grant of qualified immunity to officers who stopped a woman from praying after they broke into her apartment in response to a noise complaint. 585 U.S. 957, 960 (2018) (per curiam).  The Tenth Circuit ruled for the officers because the woman failed to "identify a single case in which this court, or any other court for that matter, has found a First Amendment violation based on a factual scenario even remotely resembling the one we encounter here." *Sause*, 859 F.3d 1270, 1275 (10th Cir. 2017).  The Supreme Court reversed and remanded, explaining that "[p]rayer unquestionably constitutes the 'exercise' of religion" and that, despite the absence of existing caselaw addressing the unique facts at hand, the officers had not established at the motion to dismiss stage that they were entitled to qualified immunity.  *Sause*, 585 U.S. at 959–60.

Additionally, to determine whether the law was clearly established, the Fifth Circuit differentiates between (i) "split-second excessive force cases" in which law enforcement officers must make "life-or-death" decisions (requiring an elevated degree of specificity to constitute clearly established case law) and (ii) non-split-second contexts in which an official enjoys, from a position of safety, the benefit of thinking before acting (permitting a higher level of generality and more flexible standard).  *Hughes v. Garcia*, 100 F.4th 611, 620 & n.1 (5th Cir. 2024) (noting the case did not involve "excessive force" or "split-second decisions," and thus finding law was clearly established by the "simple, clearly established rule that all officers should know at all times": "Do

not lie.");  *see also Banks v. Herbrich*, 90 F.4th 407, 416 (5th Cir. 2024); *Cox v. Kaelin*, 577 F. App'x 306, 313 (5th Cir. 2014) (rejecting as "baseless" defendant's argument that case precedent was not specific enough to be "clearly established," which held that "a reasonable officer should have known that if he retaliated against an employee for exercising his First Amendment rights, he could not escape liability by demoting and transferring the employee, rather than discharging him.").

Defendant Jones, who made a calculated decision, free from the stresses of split-second, life-or-death decision-making, and with the ability to consult attorneys, when she terminated Mr. De León for his exercise of protected speech, may not shield herself from liability with the more exacting clearly established standard that is reserved for law enforcement officers whose lives are on the line.

### Defendant Jones violated clearly established First Amendment law by terminating Mr. De León

For nearly thirty years, clearly established law has prohibited the government from terminating employees and independent contractors, alike, for exercising their First Amendment rights to free speech. *See, e.g.*, *Bd. of Cnty. Comm'rs v. Umbehr*, 518 U.S. 668, 684 (1996); *Oscar Renda Contracting, Inc. v. City of Lubbock*, 463 F.3d 378 (5th Cir. 2006).

Mr. De León's First Amendment retaliation claim is supported by controlling precedent holding that a government employer—whether in the independent contractor or employee context—may not terminate (or otherwise take adverse employment action against) an individual for engaging in protected speech. *See, e.g.*, *Rankin v. McPherson*, 483 U.S. 378 (1987) (sheriff's department employee terminated for joking about assassination of President); *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274 (1977) (teacher terminated for criticizing school's dress code); *Perry v. Sindermann*, 408 U.S. 593 (1972) (non-tenured professor terminated for

criticizing university's policies); *Pickering v. Bd. of Educ.*, 391 U.S. 563 (1968); *Cutler v. Stephen F. Austin State Univ.*, 767 F.3d 462, 475 (5th Cir. 2014) (director of state university's art galleries terminated for referring to U.S. Representative as a "fear monger"); *Charles v. Grief*, 522 F.3d 508 (5th Cir. 2008) (state lottery commission employee terminated for complaints concerning racial discrimination).

A First Amendment retaliation claim has four elements: "(1) [the plaintiff] suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action." *Anderson*, 845 F.3d at 590; *see also Kinney*, 367 F.3d at 356 (noting that the First Amendment retaliation analysis applicable to public employees is also applicable to the government's independent contractors). Elements (1) and (4) are indisputable given Defendants' express acknowledgement that Mr. De León was terminated as Poet Laureate (element 1) solely on the basis of the speech that Mr. De León used in his elegy (element 4). Elements (2) and (3) are also readily met.

Whether speech involves a matter of public concern "must be determined by the content, form, and context of a given statement, as revealed by the whole record." *Coughlin v. Lee*, 946 F.2d 1152, 1156 (5th Cir. 1991) (citation omitted). The Supreme Court construes "public concern" broadly to include any speech that "can be fairly considered as relating to any matter of political, social, or other concern to the community" or "is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Lane v. Franks*, 573 U.S. 228, 241 (2014) (cleaned up). This includes speech on cultural issues and "controversial subjects such as climate change, the Confederacy, sexual orientation and gender identity, evolution, and minority religions." *Janus v. Am. Fed'n of State, Cnty., and Mun. Emp., Council 31*, 138 S. Ct. 2448, 2476

(2018).  "The arguably inappropriate or controversial character of a statement is irrelevant to the question whether it deals with a matter of public concern." *Snyder v. Phelps*, 562 U.S. 443, 453 (2011) (cleaned up).

Mr. De León's elegy plainly qualifies as a matter "of public concern."  Mr. De León posted the elegy on his Facebook page, which was open to the public, as a cultural tribute to and celebration of the life of Dr. Roberto 'Cintli' Rodriguez—a widely renowned figure in the Chicano community who passed away just a few days before Mr. De León posted the poem.  At that time, Dr. Rodriguez's passing was unquestionably a subject of "legitimate news interest" and "of value and concern to the public," including the Chicano community.[7]

On element (4), Mr. De León's interest in the speech expressed in his elegy greatly outweighs any interest Defendants might have in the "efficient provision of public services." Whereas Mr. De León had a clear interest in exercising his First Amendment right, as an American citizen, on a topic of public concern regarding the recent death of a widely celebrated Chicano activist and journalist, Defendants have provided no indication that Mr. De León's elegy impaired the Department of Arts and Culture's operations to even the slightest degree.  Supreme Court and Fifth Circuit precedent have made eminently clear that the relevant issue on this question is "not the weight of [a] governmental interest considered in abstract terms," but rather, courts must assess how the speech actually or potentially "*affects* the government's interest in providing services

---

[7] *See, e.g.*, "Roberto Rodriguez, prolific writer on Chicano life, dies at 69," Los Angeles Times (Aug. 1, 2023), at https://www.latimes.com/obituaries/story/2023-08-01/roberto-cintli-rodriguez-dead; "UA professor & Chicano activist Roberto 'Cintli' Rodriguez dead at 69," Tucson Sentinel (Aug. 2, 2023), at https://www.tucsonsentinel.com/local/report/080223_roberto_rodriguez_obit/ua-professor-chicano-activist-roberto-cintli-rodriguez-dead-69/; "Roberto Cintli Rodriguez, Chicano Writer, Professor and Activist, Has Died at 69," Democracy Now! (Aug. 2, 2023), at https://www.democracynow.org/2023/8/2/headlines/roberto_cintli_rodriguez_chicano_writer_professor_and_activist_has_died_at_69.

efficiently." *Kinney*, 367 F.3d at 362 (plaintiff's First Amendment interest outweighed defendants' interest in official operation of service where the primary workplace disruptions were the result of government employer's retaliatory actions); *see also Salge v. Edna Indep. Sch. Dist.,* 411 F.3d 178, 195 n.64 (5th Cir. 2005) ("[W]hen we evaluate the impact of a plaintiff's speech on a defendant employer's operations, we inquire whether the speech impacted the actual operations of the employer in providing its day-to-day services, such as the circulating of books at the library or the continuation of classes at school, as opposed to creating a bureaucratic hassle."); *Brawner v. City of Richardson*, 855 F.2d 187, 192 (5th Cir. 1988); *Moore v. City of Kilgore,* 877 F.2d 364, 375 (5th Cir. 1989) (employee firefighter's speech did not hinder ability of fire department to perform "*its primary task*" of fighting fires, as opposed to causing a general burden on efficient operation of the city as an organization, thus employer's interest in efficiency was entitled to little weight as opposed to the employee's speech).

Defendants have offered no evidence or indication that Mr. De León's elegy impaired or impeded the Department of Arts and Culture's day-to-day operations or primary tasks in any way. Mr. De León's fundamental right to free speech on a matter of public concern easily outweighs Defendants' evidently unimpeded interest in avoiding disruptions in its daily operations.

Furthermore, it is clearly established in the Fifth Circuit that, in the context of First Amendment retaliation, a government employer is required to conduct a "reasonable investigation" of an employee's speech prior to taking adverse employment action. *Salge*, 411 F.3d at 178, 192; *see also Cutler*, 767 F.3d at 475 (it is "beyond debate" what constitutes a "reasonable investigation" prior to terminating public employees for protected speech).

Defendants failed to conduct any semblance of a reasonable investigation prior to their termination of Mr. De León for his use of a word in a language with which, by all indications,

Defendants are unfamiliar.  Defendants never once met to speak with him to ask about his elegy or any language perceived to be derogatory or offensive therein prior to terminating him as Poet Laureate.  Nor did Defendants contact a linguist or speaker of Chicano Caló. To the best of Plaintiff's knowledge, no investigation whatsoever was conducted—in plain violation of clearly established law.  In short, no attempts were made to determine if there was valid reason to terminate Mr. De León's contract.  Accordingly, Defendant Jones, again, is not entitled to qualified immunity from Mr. De León's First Amendment claims.

***Defendant Jones violated clearly established First Amendment law prohibiting viewpoint discrimination***

It is well-established that in any type of forum, the government must refrain from discriminating against speakers based on their viewpoint—including those that might insult, offend, or even wound. *See, e.g.*, *Matal*, 582 U.S. at 223 ("Speech may not be banned on the ground that it expresses ideas that offend," including terms that some may view as "derogatory" or a "racial slur"); *Hurley*, 515 U.S. at 579 ("[T]he law ... is not free to interfere with speech for no better reason than promoting an approved message or discouraging a disfavored one, however enlightened either purpose may strike the government"); *Johnson*, 491 U.S. at 414 ("If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable"); *FCC v. Pacifica Found.*, 438 U.S. 726, 745 (1978) ("[T]he fact that society may find speech offensive is not a sufficient reason for suppressing it. Indeed, if it is the speaker's opinion that gives offense, that consequence is a reason for according it constitutional protection"); *Street v. New York*, 394 U.S. 576, 592 (1969) ("[T]he public expression of ideas may not be prohibited merely because the ideas are themselves offensive to some of their hearers"); *cf. Coates v. City of Cincinnati*, 402 U.S. 611, 615 (1971) ("Our decisions establish that mere public intolerance or animosity cannot be the

21

basis for abridgment of ... constitutional freedoms").  After all, viewpoint discrimination is "an egregious form of content discrimination," *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 829 (1995), and a "poison to a free society," *Iancu v. Brunetti*, 588 U.S. 388, 399 (2019) (Alito, J., concurring).

Defendants admittedly punished Mr. De León solely on the basis of his viewpoints concerning Chicano Caló and the use and meaning of its terms as expressed in the context of his elegy.  Indeed, Defendants terminated Mr. De León without notice, without investigation, and, evidently, without familiarity with the language.  Defendants' erroneous belief that Mr. De León used the Caló term "mayates" in his elegy in a derogatory manner or as a racial slur that some might find offensive is irrelevant to the viability of Mr. De León's viewpoint discrimination claim—"[g]iving offense is a viewpoint." *See Matal*, 582 U.S. at 243; *id.* at 228-29 (viewpoint discrimination notwithstanding: (i) government's finding that many would find the term at issue "offensive," (ii) government's reliance on "numerous dictionaries" that defined "slants" as a derogatory or offensive term; and (iii) fact that "several bloggers and commenters to articles on the band" expressed their offense at the term).  *See also Terminiello v. City of Chicago,* 337 U.S. 1, 4 (1949) (explaining that one function of the First Amendment "is to invite dispute.") … Speech is often provocative and challenging. It may strike at prejudices and preconceptions and have profound unsettling effects as it presses for acceptance of an idea. That is why freedom of speech, though not absolute, is nevertheless protected against censorship or punishment.")

Decades of controlling case law armed Defendant Jones with notice and "fair warning" that her actions against Mr. De León would constitute viewpoint discrimination in violation of Mr. De León's fundamental First Amendment right to free speech.  Accordingly, Jones is not entitled to qualified immunity.

II.     **Neither the City nor Krystal Jones is Immune from Liability for Defaming Mr. De León**

 A.  *The City's Poet Laureate program is a proprietary function*

Defendants have transformed the interplay between § 1983 and the TTCA (or lack thereof) into a game of heads-I-win-tails-you-lose.  At the heart of Defendants' argument are two untenable and contradictory positions, as discussed above: in the context of Mr. De León's First Amendment claims, Defendants self-servingly embrace the notion that the Poet Laureate program is a *private*, proprietary function in order to sidestep § 1983 liability.  At the same time, Defendants argue that the program is governmental, rather than proprietary with respect to Mr. De León's defamation claim to bypass liability on that front, as well.  Contradictory positions aside, the City's defamatory statements concerning Mr. De León were made in connection with the City's Poet Laureate program—a non-essential, proprietary function, which the City performed in its discretion, primarily for the benefit of its own residents, rather than as an arm of the State.  Accordingly, Defendants are not immunized from liability under the TTCA.

The TTCA provides two respective lists of examples of municipal functions designated as either "governmental" or "proprietary." 5 TEX. CIV. PRAC. & REM. § 101.0215.  Both lists are non-exhaustive, and "poet laureate program" appears on neither.  Yet according to Defendants, the Poet Laureate program (including the Poet Laureate contract)  cannot be a proprietary function because the Poet Laureate program is unlike the three examples of proprietary functions specified in the TTCA's non-exhaustive list of examples.  ECF No. 14 ¶¶29, 31.  There are two flaws in this assertion.

First, Defendants assert that, with respect to non-exhaustive lists "where the more specific items, [a] and [b], are followed by a catchall 'other,' [c]…the latter must be limited to things like the former."  ECF No. 14 ¶ 29 (citation omitted).  Perhaps that is so, but the TTCA's provision concerning proprietary functions does not contain a "catchall 'other,'" nor do "general words

follow an enumeration of two or more things." *Id*. Rather, the provision defines "proprietary functions" as "those functions that a municipality *may*, in its discretion, perform in the interest of the inhabitants of the municipality" (emphasis added) and follows with a non-exhaustive list of three examples, none of which are similar to the other: (1) "the operation and maintenance of a public utility;" (2) "amusements owned and operated by the municipality;" and (3) any activity that is abnormally dangerous or ultrahazardous." *Id.* § 101.0215(b)(1)–(3).

Second, the TTCA's list of examples of governmental functions is also non-exhaustive. Likewise, of the 36 examples provided, none are substantively similar to the Poet Laureate program—and the vast majority are significantly different. *See id.* § 101.0215(a) (including functions such as: "police and fire protection and control," "health and sanitation services," "cemeteries and cemetery care," "hospitals," "airports," "tax collections," "engineering functions," and "water and sewer service"). Under Defendants' reasoning, it seems that the Poet Laureate program would be deemed neither governmental, nor proprietary.

Defendants' arguments with respect to the *Wasson II* factors are equally flawed. In *Wasson II*, the Texas Supreme Court explained that, for those functions not specified as "governmental" or "proprietary" in the TTCA, courts must consider whether a city's act was: (1) mandatory or discretionary; (2) intended to primarily benefit the general public or the city's residents, (3) done on the State's behalf or on its own behalf; and (4) sufficiently related to a government function to render the act governmental even if it would otherwise have been proprietary. *City of Brownsville v. Nezzer*, 2022 WL 2251818 *3 (Tex. App. Corpus Christi 2022) (citing *Wasson Ints., Ltd. v. City of Jacksonville*, 559 S.W.3d 142, 150 (Tex. 2018) (*Wassan II*)).

Defendants contend that there is no evidence or plausible pleading that the Poet Laureate contract was discretionary (factor 1), nor that the contract was "for the benefit of the State" (factor

24

3).  ECF No. 14 ¶ 32.  First, plaintiffs are not required to provide evidence at the motion to dismiss stage.  Second, however, Mr. De León has plausibly pled that the City's choice to enter into the Poet Laureate contract with him was discretionary, not mandatory, and that the contract was entered into on the City's own behalf, not the State's.  As far as Plaintiffs can determine, nothing in the Texas legislature nor Texas Constitution mandates that the City operate a poet laureate program (or that the City enter into any particular poet laureate contract).  *See City of League City v. Jimmy Changas, Inc*., 670 S.W.3d 494 (Tex. 2023) (City's act of entering into contract was "clearly discretionary" where no state law required City to enter into contract for purpose of promoting local economic development).

According to Defendants, the pleadings suggest that the Poet Laureate contract was governmental under the second factor because the contract granted the City a non-exclusive license to use Mr. De León's poetry "for the promotion of poetry, the arts *and tourism* in San Antonio." ECF No. 14 ¶ 33.  While promoting San Antonio for tourism might benefit some non-resident tourists outside of San Antonio, the contract itself confirms that the City entered into it "*primarily* for the benefit of those within the corporate limits of the municipality." *Wasson II*, 559 S.W. 3d at 151.  Indeed, the Poet Laureate contract expressly and repeatedly states that the Poet Laureate's purposes were to "serve as *the City's* Poet Laureate," to "promote poetry and the literary arts *in San Antonio*," to "promote literacy *in the community*," and to assist in developing "programs and activities to celebrate *San Antonio's* people, places, and history."  ECF 10-1 at 1-2 (emphasis added); *see also City of League City*, 670 S.W.3d at 504 (City agreement was "*primarily*" for the benefit of City's residents even though other Texas citizens could also benefit from new restaurant).

As for the third factor, the City did not act as a "branch of the state," *Wasson* I, 489 S.W. at 430, or as an "arm of the government," *Tooke v. City of Mexia,* 197 S.W. 3d 325, 343 (Tex. 2006), rather than on its own behalf when it entered into the Poet Laureate contract with Mr. De León.  That much is again clear from the contract itself, which provides no indication that the State would fund, benefit from, oversee, or otherwise involve itself in any aspect of the contract or Poet Laureate program. Indeed, the only parties to the contract are Mr. De León and the City (and Defendant Jones as the City's agent). ECF No. 10-1.  Moreover, "when the first and second factors both indicate that a city entered into a contract as a proprietary function" (as they do here), "then the city was likely acting on its own behalf." *City of League City*, 670 S.W.3d at 505.

With respect to *Wasson II*'s fourth factor, Defendants contend that the "Poet Laureate contract" is sufficiently related to the governmental functions of "museums, libraries, civic, convention centers or coliseums." ECF No. 14 ¶ 34 (citing § 101.0215(a) (14)-(17)).  Defendants claim that this is so because: "[h]aving a poet laureate is governmental because governments have poets laureate," and because poets laureate "are the government's expression-by-association," as well as an "aspirational mirror of civic conscience."  ECF No. 14 ¶ 35.  While this reasoning is indeed poetic, Plaintiff must disagree.  As the Texas Supreme Court recently made clear: "We have long held that not all activities 'associated' with a governmental function are 'governmental,'" and "[t]he fact that a city's proprietary action 'touches upon' a governmental function is insufficient to render the proprietary action governmental." *City of League City*, 670 S.W.3d at 505 (citing *Wassan II*, 559 S.W.3d at 152-53.  Rather, a city's proprietary function may be treated as governmental "only if it is ***essential*** to the city's governmental actions." *Id*. at 153.  The Poet Laureate program, though of artistic and cultural value to the community, is not integral to the

City's essential functions or responsibility for the general welfare, education, and community engagement of its residents.

B. *Plaintiffs Have Pleaded a Plausible Defamation Claim*

Defendants erroneously contend that Mr. De León's defamation claim fails because he alleged no element of falsity, as Mr. De León did, in fact, use the word "mayates" in his elegy, which Defendants—with no apparent familiarity with, let alone fluency in, Chicano Caló—have deemed a universally derogatory racial slur.  This overly simplistic analysis ignores critical context and cultural nuances, while at the same time stifling conversation and debate concerning the word's origins, evolution, and varying cultural interpretations.[8]

Defendants contend that "[i]f a statement is true, it is not defamatory."  ECF No. 14, ¶ 37. This misstates the law.  Under the defamation-by-implication doctrine, defendants may be held liable for statements that are "literally or substantially true," but which fail to put the facts in the proper context and thus create a substantially false or defamatory impression, or "gist."  *Dall. Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 627 (Tex. 2018); *see also Turner v. KTRK Television, Inc.*, 38 S.W .3d 103 (Tex. 2000).  Additionally, when a plaintiff claims defamation by implication, courts must determine whether the implication that the plaintiff alleges "is among the implications that [an] objectively reasonable reader would draw."  *Dall. Morning News, Inc.*, 554 S.W. 3d at 631.  If so, the next question is whether that meaning is "reasonably capable" of defaming the plaintiff.  *Id.*

---

[8] As alleged in the Amended Complaint, Chicano Caló has been erroneously stigmatized by certain segments of American society as a low-class, gang-related, or offensive language—largely as a result of the negative stereotypes that arose in the United States after decades of discrimination, segregation, and police brutality directed toward Mexican Americans prior to (and during) the Chicano civil rights movement in the 1960s and 1970s. ECF No. 10 ¶ 38. Mr. De León has thus dedicated his work to the revival, affirmation, and redemption of Caló.

As such, the critical question is not whether Mr. De León actually used the word "mayate," but whether the implication of Defendants' statements representing that Mr. De León used a racial slur and wrote a poem "contrary to the City's values," which include "denouncing racism," resulting in his termination as Poet Laureate, created a false or defamatory impression. The City's statements would readily imply to an objectively reasonable reader (and the public at large) that Mr. De León was fired for engaging in racist conduct, which is demonstrably untrue. Defendants' omission of critical context—namely, the nuanced, cultural meanings of "mayate" in Chicano Caló and the context of Mr. De León's elegy, which was dedicated to a Chicano activist who had dedicated his career to fighting racial injustice—exacerbates the defamatory nature of the implication. As detailed in the Amended Complaint, Defendants' statements have already proven "reasonably capable" of defaming Mr. De León who has suffered, and continues to suffer, grave harm to his reputation, as well as public hatred, contempt, and financial injury, among other things. *See id.* at 637-38 (in Texas, a statement is defamatory if it "tends to injure a living person's reputation and thereby expose the person to public hatred, contempt or ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation."); *id*. at 638 (under Texas common law, a statement is defamatory per se when it is "so obviously harmful that general damages, such as mental anguish and loss of reputation, are presumed.") (quoting *In re Lipsky*, 460 S.W.3d 579, 589 (Tex. 2015)).

Mr. De León has thus adequately pled that Defendants' misrepresentation of his speech as racist and derogatory were objectively false and defamatory.

## **CONCLUSION**

For the reasons described herein, along with those detailed in the Amended Complaint, Defendants' Motion to Dismiss should be denied, and Mr. De León should be permitted to proceed with his claims.

October 26, 2024

Respectfully submitted.

/s/ Casey Norman
Casey Norman (5772199)
Jenin Younes (*Pro Hac Vice*)
NEW CIVIL LIBERTIES ALLIANCE
4250 N. Fairfax Drive, Suite 300
Arlington, Virginia 22203
(202) 869-5210
Casey.Norman@ncla.legal

*Counsel for Plaintiff*

## CERTIFICATE OF SERVICE

I certify that, on October 26, 2024, a true and correct copy of the foregoing was filed with the United States District Court for the Western District of Texas and electronically served on all counsel of record via the District's ECF system.

/s/ Casey Norman
Casey Norman