**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| NEPHTALI DE LEÓN, | § | |
| *Plaintiff* | § | |
| | § | SA-24-CV-00849-XR |
| -vs- | § | |
| | § | |
| CITY OF SAN ANTONIO, KRYSTAL | § | |
| JONES, EXECUTIVE DIRECTOR OF | § | |
| THE DEPARTMENT OF ARTS AND | § | |
| CULTURE OF THE CITY OF SAN | § | |
| ANTONIO, IN HER INDIVIDUAL | § | |
| CAPACITY; | § | |
| *Defendants* | § | |

## ORDER ON MOTION TO DISMISS

On this date, the Court considered Defendants' motion to dismiss in part Plaintiff's Amended Complaint (ECF No. 14), Plaintiff's response (ECF No. 24), and Defendants' reply (ECF No. 25). After careful consideration of the briefing and the parties' oral arguments on January 7, 2025, the Court **GRANTS** the motion.

## BACKGROUND

This case involves the City of San Antonio's ("City") termination of its Poet Laureate for using the word "mayate," a well-known racial slur in the Spanish community, in an elegy posted on his personal Facebook page. It requires the Court to consider whether the First Amendment protects this speech, as well as governmental immunity and state-law defamation-by-implication.

### I.    Facts

**Nephtali De León.** Plaintiff Nephtalí De León ("De León") is a poet, writer, and artist who celebrates Chicano culture and language. ECF No. 10 ¶¶ 23, 28–34. Chicano is an ethnic identity for some Mexican Americans that emerged from the Chicano Movement, which first gained national recognition and a distinct cultural platform in the 1960s and early 1970s. *Id.* ¶ 28. Among

1

the founding fathers of Chicano literature, De León's work has examined Chicano history and cultural evolution and reported on racial and social injustices. *Id.* ¶¶ 29–33.

In his work, De León uses a mix of languages, including Chicano Caló, a code-switching dialect which combines English, Spanish, Nahuatal, and Spanish Romani. *Id.* ¶¶ 26–27, 36. De León believes that Caló has been erroneously stigmatized by certain segments of American society as "low-class, gang-related, or offensive language," largely because of the negative stereotypes that arose in the United States directed towards Mexican Americans prior to (and during) the Chicano Movement. *Id.* ¶ 38. By incorporating Caló in his work, De León contends he promotes its social, historical, and literary functions and redeems its ancient origins, as well as its dynamic role in contemporary society, both within and outside the Chicano community. *Id.* ¶¶ 6, 39.

In 2023, the City selected him to serve as the City's Poet Laureate from April 2023 until March 2026. *Id.* ¶ 46. At the time, the City's Mayor, Ron Nirenberg, praised De León, stating that the role of artists is to "challenge standard views and narratives, and create new approaches to view ourselves in the city," which is what De León has done "his entire life." *Id.* ¶ 9.

**San Antonio's Poet Laureate Program.** Operated by the City's Department of Arts and Culture ("DAC"), the Poet Laureate program was launched in 2012. *Id.* ¶¶ 40–41. The Poet Laureate "promote[s] poetry and the literary arts in San Antonio and is tasked with developing innovative and inspiring public events and programs in conjunction with local organizations and the [DAC]." *Id.* ¶ 43.

After being selected, De León entered into a professional services agreement ("Agreement") with the City. *Id.* ¶ 49. The Agreement provided that De León was a "Contractor" and set forth his duties, which included cultivating interest in the arts and literacy in the City, participating in events, and developing initiatives. *Id.* ¶ 52. Under the Agreement, De León agreed

to be interviewed by news outlets and mention the DAC in "at least three positive social media posts, and whenever applicable in interviews/public appearances." *Id.* ¶ 53.[1] The Agreement also required De León to comply with the City's Non-Discrimination Ordinance.[2]

**Termination Clause.** The Agreement required that all work be performed "to the satisfaction of [DAC's Executive Director, Krystal Jones]." *Id.* ¶ 56. If Jones found De León's work unsatisfactory, the City could terminate the Agreement, subject to two protections: (1) ten days' written notice for termination without cause, and (2) written notice with a fifteen-day cure period for defaulting—failure to perform or comply with the Agreement or unsatisfactory performance. *Id.* ¶¶ 56–60; ECF No. 10-1 (Agreement) §§ 7.2, 7.4.[3]

**De León Posts an Elegy of His Friend on Facebook.** On July 31, 2023, around four months into his tenure as Poet Laureate, De León's long-time friend and another prolific Chicano writer, passed away. *Id.* ¶ 64. The next day, De León posted an elegy on his personal Facebook account titled "Dr. Roberto 'Cintli' Rodriguez (asiosito carnal), which he asserts means "goodbye brother" in Caló. *Id.* ¶ 65 & n.30; ECF No. 10-2.

The poem was written in English, Spanish, and Caló and celebrated Dr. Rodriguez as a unifying force in the Chicano community. The elegy did not mention the City, the DAC, or De León's position as Poet Laureate. But the elegy included a line that Dr. Rodriguez "touched so many Raza[,] gavachos y mayates, he touched everyone between two cultures and two nations." *Id.* ¶ 68. According to De León, the English translation of "Raza[,] gavachos y mayates" in the

---

[1] De León received $10,500 for his services as well, to be paid in three installments of $3,500. *Id.* ¶ 54. To date, De Leon has been paid one installment. *Id.* ¶ 55. De León seeks the remaining installments as damages.

[2] This Ordinance prohibits discrimination "on the basis of race, color, religion, national origin, sex, sexual orientation, gender identity, veteran status, age or disability, unless exempted by state or federal law, or as otherwise established in this Agreement." *Id.* ¶ 62.

[3] The Court considers documents De León attached to his pleading on a motion to dismiss, including the Agreement. *Gomez v. Galman*, 18 F.4th 769, 775 (5th Cir. 2021).

context of his elegy is "Chicanos, Whites, and Blacks." *Id.* ¶ 68. Initially, De León received some positive community feedback. *Id.* ¶ 71.

But others began questioning the use of the word "mayates." *Id.* ¶ 72. One commentor, while acknowledging that "the same word can mean different things for different Spanish-speaking cultures," asked De León's Facebook followers: "How about the rest of you? How do you feel about using the word mayate for Black people? Is it racist?" *Id.* ¶ 72. This sparked online debate. Some users condemned De León's use of "mayates" as an offensive and racist term, while others defended De León and his use of a Caló term in an elegy. *Id.* ¶ 73.

A week later, on August 9, 2024, De León responded to this discussion. He apologized "to anyone that may [have been] offended by [his] use of Caló words" but disagreed that it was a "racist" term, describing the root of "mayate," social biases surrounding its use, and his intent behind using the word. *Id.* ¶¶ 74–76; ECF No. 10-3. According to De León, designating the Caló word "mayate" as racist exemplifies the over-policing imposed by the predominately English-speaking American populace, which stifles spontaneity and dampens creativity. *Id.* ¶¶ 81, 83; ECF No. 10-3 at 2. As opposed to the "n-word" in the United States, according to De León, the word "mayate" did not originate in racism or slavery and those who speak Caló do not assign a derogatory meaning to the word when they use it. ECF No. 10 ¶ 77. According to De León, "mayate" in Caló is comparable to the Spanish term "negro/negra," used as a neutral or endearing descriptor for Black people. *Id.* ¶ 78.

**De León is Terminated.** De León alleges that the City learned of his elegy from two letters that were sent to the DAC, which urged the City to act. *Id.* ¶ 87. The specifics of these letters are unknown. But five days after he posted his elegy, Jones called De León into her office. *Id.* ¶ 89. When he arrived, Jones told him that his elegy was "counter to the City's ethics" because it used

a "racial slur." *Id* ¶ 90. Jones said she would "not waste time and just get to the point," that his contract as Poet Laureate would be terminated, handed him a resignation form, and told him he would have no time to consider his decision. *Id.* ¶¶ 92, 94.

After declining to resign on the spot, De León received a letter of termination signed by Jones later that day ("Termination Letter"). *Id.* ¶ 98; ECF No. 10-5.[4] Referencing its adoption of "principles and policies that reflect a diverse community such as the City's Non-Discrimination Ordinance," the Termination Letter stated that "[a]ctions from employees, contractors, or representative that negatively reflect on [the DAC] by violating the word or spirit of this ordinance are not tolerated." *Id.* It stated that the City's Poet Laureate "serves to promote poetry in compliance with the City's values," which "unite the community, denounce racism, and work to create equitable communities for all our residents." *Id.* It stated that it had "come to the City's attention that [De León recently posted a poem that included a racial slur," which was "contrary to the City's principles and is unbecoming of the City's Poet Laureate." *Id.* For these reasons, De León was terminated without cause under the Agreement. *Id.*

**Press Release of De León's Termination.** Within twenty-four hours, the City released a press statement that announced De León was terminated for posting "a poem contrary to the City's values," which included "denouncing racism among other oppressive barriers." *Id.* ¶ 107. Several local news outlets reported on the termination. One reported that De León used a "racial slur" in a poem. *Id.* ¶¶ 108–09. Others said he used a "Spanish" word that is derogatory and racist towards Black people. *Id.* ¶ 112. And one article quoted the City's Assistant City Manager who said De León was terminated because he "posted a poem that included a Spanish racial slur." *Id.* ¶ 110.

---

[4] The Court considers the Termination Letter attached to De León's pleading. *See supra* note 3.

De León claims he has suffered damage to his professional reputation, financial loss, and the loss of career opportunities and prospects. *Id.* ¶ 118. While he had never been accused of using racist, discriminatory, or otherwise derogatory language in any of his works, online search results are now dominated by headlines of news and media outlets referencing his termination for using a "racial slur." *Id.* ¶ 120.

## II.    <u>Procedural History</u>

After an unsuccessful attempt to settle with the City, *id.* ¶¶ 115–16; ECF No. 10-5, this action followed.

In the operative complaint, De León asserts two claims under Section 1983 against Jones in her individual capacity for First Amendment retaliation and viewpoint discrimination, a claim for defamation against Jones and the City, and a claim for breach of contract against the City. ECF No. 10 ¶¶ 151–205. With respect to remedies, De León seeks declaratory and injunctive relief, as well as actual and nominal monetary damages and attorney's fees. *Id.* at 40–41.

Defendants move to dismiss all claims except the breach of contract under Rule 12(b)(6). ECF No. 14. Jones asserts that De León's Section 1983 claims should be dismissed because (i) his termination was not state action and (ii) she is entitled to qualified immunity.[5] Defendants assert that De León's defamation claim (i) is barred by governmental immunity and (ii) fails to state a claim because any allegedly defamatory statements are "substantially true."

## <u>ANALYSIS</u>

## I.    **Legal Standard**

Federal Rule of Civil Procedure 12(b)(6) allows a party to move for the dismissal of a complaint for "failure to state a claim upon which relief can be granted." To survive a motion to

---

[5] Jones also argues that De León failed to assert a Fourteenth Amendment due process claim, ECF No. 14 at 5–9, but De León did not bring this claim, ECF No. 24 at 4 n.2. So the Court does not address this.

dismiss, "a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A claim for relief must contain: (1) "a short and plain statement of the grounds for the court's jurisdiction"; (2) "a short and plain statement of the claim showing that the pleader is entitled to the relief"; and (3) "a demand for the relief sought." FED. R. CIV. P. 8(a). A plaintiff "must provide enough factual allegations to draw the reasonable inference that the elements exist." *Innova Hosp. San Antonio, L.P. v. Blue Cross & Blue Shield of Ga., Inc.*, 995 F. Supp. 2d 587, 602 (N.D. Tex. Feb. 3, 2014) (citing *Patrick v. Wal–Mart, Inc.-Store No. 155,* 681 F.3d 614, 617 (5th Cir. 2012)); *see also Torch Liquidating Trust ex rel. Bridge Assocs. L.L.C. v. Stockstill*, 561 F.3d 377, 384 (5th Cir. 2009) ("[T]he complaint must contain either direct allegations or permit properly drawn inferences to support every material point necessary to sustain a recovery") (citations and internal quotation marks omitted).

In considering a motion to dismiss under Rule 12(b)(6), all factual allegations from the complaint should be taken as true, and the facts are to be construed in the light most favorable to the nonmoving party. *Fernandez-Montes v. Allied Pilots Ass'n.*, 987 F.2d 278, 284 (5th Cir. 1993). Still, a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "'[N]aked assertions' devoid of 'further factual enhancement,'" and "threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not entitled to the presumption of truth. *Iqbal*, 556 U.S. at 678 (quoting *Twombly*, 550 U.S. at 557); *see also R2 Invs. LDC v. Phillips*, 401 F.3d 638, 642 (5th Cir. 2005) (stating that the Court should neither "strain to find inferences

favorable to the plaintiffs" nor accept "conclusory allegations, unwarranted deductions, or legal conclusions.").

## II.    State Action and Government Speech

Jones argues that De León's Section 1983 claims should be dismissed for lack of state action, and that De León's speech was government speech outside the ambit of the First Amendment. The Court disagrees.

### A.  State Action

Section 1983 provides a cause of action against "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State" deprives someone of a federal constitutional or statutory right. 42 U.S.C. § 1983.

A two-pronged test applies to determine whether state action exists: (1) the alleged constitutional deprivation was "caused by the exercise of some right or privilege created by the state or by a rule of conduct imposed by the state or by a person for whom the state is responsible," and (2) "the party charged with the deprivation must be a person who may fairly be said to be a state actor." *Lugar v. Edmondson Oil Co., Inc.*, 457 U.S. 922, 937 (1982).

These prongs "collapse into each other when the claim of a constitutional deprivation is directed against a party whose official character is such as to lend the weight of the State to his decisions." *Id.* (citing *Monroe v. Pape*, 365 U.S. 167, 172 (1961)). In other words, the second prong is automatically satisfied where, as here, the individual defendant is a governmental actor who used "official powers" to facilitate the challenged actions rather than a mere private party. *See id.*

There is no question that Jones is a state actor. She is employed by the City as the Director of the DAC, and is responsible for the planning, oversight, and execution of the DAC's programs,

including the Poet Laureate. ECF No. 10 ¶ 21. *See Crawford v. City of Houston*, 386 F. Supp. 187, 191 (S.D. Tex. 1974) ("city employees responsible for the administration of public employment [are] clothe[d] . . . with the responsibility for the public affairs" and are state actors). And she terminated De Leon's employment—allegedly in violation of his First Amendment rights—using her "official powers" as the Director of DAC. *Kallinen v. Newman*, 616 F. Supp. 3d 645, 650 (S.D. Tex. 2022) ("The key question in the Fifth Circuit is whether a defendant official 'used his official powers to facilitate his actions.'" (citing *Bustos v. Martini Club Inc.*, 599 F.3d 458, 465 (5th Cir. 2010))).

Although De León was terminated under the Agreement—and asserts a separate breach-of-contract claim against the City—the terms of the Agreement do not govern his Section 1983 claims alleging that his termination was motivated by First Amendment retaliation and viewpoint discrimination. *See Massó-Torrellas v. Municipality of Toa Alta*, 845 F.3d 461, 468 n.7 (1st Cir. 2017). Jones did not act in a purely contractual capacity when she terminated De León because "the [First Amendment] right at issue is not governed by the terms of the parties' contract." *Preston Hollow Capital, L.L.C. v. Cottonwood Dev. Corp.*, 23 F.4th 550, 554 (5th Cir. 2022) (citation omitted).

Jones's argument that the Texas Tort Claims Act ("TTCA") dissolves any state action because the Poet Laureate program is merely a "proprietary function" of the City is not persuasive. Under this theory, the TTCA's classification of proprietary functions as "non-governmental" for immunity purposes is dispositive of the state-action inquiry for Section 1983 purposes. Jones cites no authority for this proposition, which improperly conflates two distinct inquiries.

### B. Government Speech

Jones raises a threshold argument that De León's elegy is government speech, and so is not protected by the First Amendment. ECF No. 25 at 8 (citing *Garcetti v. Ceballos*, 547 U.S. 410 (2006)). Under *Garcetti*, when individuals charged with speaking on behalf of the government act within the scope of their power to do so, they "are not speaking as citizens for First Amendment purposes." 547 U.S. at 421. This is because the government may "express its views when it receives assistance from private sources for the purpose of delivering a government-controlled message." *Pleasant Grove City, Utah v. Summum*, 555 U.S. 460, 468 (2009).

A trilogy of Supreme Court cases—*Shurtleff*, *Walker*, and *Summum*—guide the inquiry. In *Shurtleff v. City of Boston*, the Court held that determining whether speech is "government speech" requires "conduct[ing] a holistic inquiry" that is "driven by a case's context rather than the rote application of rigid factors." 596 U.S. 243, 252 (2022). The Court laid out certain indicia to "guide the analysis, including [1] the history of the expression at issue; [2] the public's likely perception as to who (the government or a private person) is speaking; [and] [3] the extent to which the government has actively shaped or controlled the expression." *Id.* (numeration added). The government speech doctrine "is susceptible to dangerous misuse," given that "[i]f private speech could be passed off as government speech by simply affixing a government seal of approval, government could silence or muffle the expression of disfavored viewpoints," *Matal v. Tam*, 582 U.S. 218, 235 (2017). So "courts must be very careful when a government claims that speech by one or more private speakers is actually government speech." *Id.* at 262 (Alito, J., concurring).

At this stage, these factors do not support a finding that De León's elegy was government speech.

**History**. "In evaluating the history factor, courts look to the medium of speech used and its historical ties to the government." *Metroplex Atheists v. City of Fort Worth*, No. 4:23-CV-736-O, 2023 WL 5025020, at * 3 (N.D. Tex. Aug. 6, 2023). Jones argues that governments "have a history of selecting and associating with private persons . . . to promote government messages like local culture, literacy, the arts, history and esthetics." ECF No. 14 at 13. But this generic assertion is untethered to the speech of the City's Poet Laureate, and private promotion of government messages does not necessarily mean that the *government* is speaking.

Even assuming the Poet Laureate conveys the City's messages—a fact unsuitable in a Rule 12(b)(6) setting—the City's Poet Laureate was only established in 2012. A program in place for less than fifteen years cannot be said to have "*long* conveyed important messages about the government." *Shurtleff*, 596 U.S. at 253 (emphasis added).

Finally, the Poet Laureate's duties—"promot[ing] poetry and literary arts" and "develop[ing] initiatives and inspiring public events," ECF No. 10 ¶ 43—do not communicate any specific government messages but are directed toward cultivating interests in the arts generally. This is a far cry from cases where history supported government speech. *See Shurtleff*, 596 U.S. at 253–54 ("[f]lags are almost as old as human civilization"); *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 210–11 (license plates historically "communicated messages from the States"); *Summum*, 555 U.S. at 470–73 ("[s]ince ancient times," governments "have long used monuments to speak to the public").

**Public Perception**. In weighing the perception of the public factor, courts look to whether the mediums of speech used "are often closely identified in the public mind with the [government]." *Summum*, 555 U.S. at 472.

Here, this factor is at best a toss-up. De León's elegy, posted on his personal Facebook page, is unlike a license plate that says "San Antonio," *see Walker*, 576 U.S. at 212, or monument in a City park, *see Summum*, 55 U.S. at 472. While the City's selection of its Poet Laureate "presents the image of the City that it wishes to project," *id.* at 473, this *selection* is not the speech at issue. It is De León's elegy. True, the public might associate it with the City, given that he was selected as the Poet Laureate. Jones argues that because the City selected De León as the Poet Laureate and "imbue[d] him with the 'San Antonio' brand," the public would associate De León with the City. ECF No. 14 at 12. But it is unclear to what extent the public is aware of De León's role. Indeed, the public might have viewed De León's post on his *personal* Facebook account as unaffiliated with the City, given that the post did not mention the City, the DAC, or his position as Poet Laureate. In this respect, the very requirements of the City's Agreement with De León undermine the City's position: if De León's affiliation with the City as Poet Laureat was self-evident in *all* his public-facing communications, why did the Agreement require him to mention the DAC in "at least three positive social media posts." ECF No. 10 ¶ 53. That the City did not require De León to mention the DAC in *all* his social media posts suggests the City understood that his communications would not otherwise be attributed to the City.

**Active Control**. In weighing the control factor, courts look to whether the government has "effectively controlled" the speech by exercising "final approval authority" over their selection with articulable and distinguishable criteria. *Summum*, 555 U.S. at 473.

In *Shurtleff*, the Court found that Boston did not actively shape and control the flag policy because, even though flag-raising events were subject to government approval, Boston "had nothing—no written policies or clear internal guidance—about what flags groups could fly and what those flags would communicate." 596 U.S. at 257. In contrast, the Court held in *Walker* that

Texas "effectively controlled the messages" conveyed on specialty license plates because the state "ha[d] sole control over the design, typeface, color, and alphanumeric pattern for all license plates" and "exercise[ed] final approval authority over their selection." 576 U.S. at 213 (citations and internal quotation marks omitted). Similarly, in *Summum*, the Court construed the monuments displayed in the park as government speech because they were selected solely by the city. 596 U.S. at 257.

Here, nothing suggests that the City actively controlled De León's work. As in *Shurtleff*, the City did not have a written policy or clear guidance about what poetry De León could post or write, online or elsewhere. While the City had "meaningful involvement," *Shurtleff*, 596 U.S. at 258, in *selecting* De León as the Poet Laureate, De León's selection is separate from the work he then conducted during his tenure Poet Laureate.[6]

Jones insists that the Agreement explicitly subjected his work to her "approval," ECF No. 14 as 12, but nothing in the text of the Agreement evinces supervisory authority over *all* of De León's speech. Rather, Section 3.2 of the Agreement provides that "all work performed by [De León] under this Agreement shall be performed to the satisfaction of [Ms. Jones]," and Section 7.4 provides an opportunity to cure any deficiencies in his performance. ECF No. 10-1 §§ 3.2, 7.4. These provisions do not confer any final approval authority over De León's speech *within* the purview of the Agreement, let alone his work outside the Agreement. Instead, they provide *post hoc* procedures for terminating De León and for permitting him to cure any issues with his performance. While the Agreement does constrain De León's activities under the City's Non-Discrimination Policy, that clause still fails to provide Jones or the City with a mechanism for pre-

---

[6] Along these lines, Jones contends that De León's termination was "an act of editorial discretion" and that the selection and termination of De León is itself government speech. ECF No. 14 at 11. This misconstrues De León's claim—the speech at issue is De León's speech, not Jones'.

approving or otherwise controlling De León's speech. The City "could easily have done more to make it clear it wished to speak for itself." *Shurtleff*, 596 U.S. at 258. As De León points out, it could have required De León to submit any poetry he wrote for review before he publicly posted it. But it did not do so.

Jones's remaining argument—that De Le León forfeited his First Amendment rights by accepting the Poet Laureat position in the first place—is unconvincing. Citing Article V of the Agreement, she asserts that De León "licensed his entire body of poetry" to the City, perpetually, "for the promotion of poetry, the arts and tourism in San Antonio." ECF No. 14 at 9. But Article V merely grants the City a "non-exclusive, perpetual, royalty-free license to utilize, reproduce and publish, in any medium, any and all of [De León's] poems for the promotion of poetry, the arts and tourism in San Antonio." ECF No. 10-1 § 5.1. Licensing his poetry to the City did not, as a general matter or under the specific terms of the Agreement, require De Leon to sacrifice his First Amendment right to *add* to his body of poetry. *See* ECF No. 10-1, Article XII (specifying that, as an "independent contractor," De León would retain "exclusive control of and exclusive right to control the details of the work performed" under the Agreement). And it certainly did not strip him entirely of his right as a citizen to speak on matters of public concern. *Garcetti*, 547 U.S. at 417.

Accordingly, the Court finds that De León's elegy is not government speech, and proceeds to the merits of his First Amendment claims.

## III.    First Amendment Retaliation

Jones argues that she is entitled to qualified immunity because she did not violate De León's First Amendment rights, and even if she did, there is no clearly established law that would have put her on notice that terminating De León's contract violated the First Amendment.

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Pearson v. Callahan*, 555 U.S. 223, 231, 1 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). To negate a defense of qualified immunity, De León must plead sufficient facts to make it plausible that Jones' conduct: (1) violated a federal right and (2) the right was clearly established at the time of the violation. *Culberson v. Clay County*, 98 F.4th 281, 286 (5th Cir. 2024). To be clearly established, "[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987); *Morgan v. Swanson*, 659 F.3d 359, 370 (5th Cir. 2011) ("The doctrine of qualified immunity protects government officials from civil damages liability when their actions could reasonably have been believed to be legal."). "Courts have discretion to decide which prong of the qualified-immunity analysis to address first." *Id.* at 371; *Pearson*, 555 U.S. at 236.

### A. Applicable Law

"To establish a [Section] 1983 claim for employment retaliation related to speech, a plaintiff-employee must show: (1) he suffered an adverse employment action; (2) he spoke as a citizen on a matter of public concern; (3) his interest in the speech outweighs the government's interest in the efficient provision of public services; and (4) the speech precipitated the adverse employment action." *Anderson v. Valdez*, 845 F.3d 580, 590 (5th Cir. 2016). This analysis applies to First Amendment claims brought by, as here, a government's independent contractors. *Bd. of Cnty. Com'rs v. Umbehr*, 518 U.S. 668, 673 (1996).

The second element requires courts to determine "whether it is plausible from the pleadings that [a plaintiff] 'spoke as a citizen on a matter of public concern.'" *Cox v. Kaelin*, 577 F. App'x

306, 311 (5th Cir. 2014) (citing *Garcetti*, 54 U.S. at 418). This is a two-step inquiry: (1) whether a plaintiff engaged in First Amendment speech as a citizen or in his role as a public employee, and (2) whether the speech involved a matter of public concern. *Lane v. Franks*, 573 U.S. 228, 241 (2014). "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community, or when it is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public." *Id.* (citation and internal quotation marks omitted). "The inquiry turns on the 'content, form, and context' of the speech." *Id.* (quoting *Connick v. Myers*, 461 U.S. 138, 147–48 (1983)).

The third element requires courts to engage in a *Pickering* balancing test. *Kinney*, 367 F.3d at 356. Under *Pickering v. Board of Educ.*, 391 U.S. 563, 568 (1968), courts "balance the speaker's First Amendment interests against the government's legitimate interests in the efficient provision of public services." *Kinney*, 367 F.3d at 361. "[T]he relevant issue is not the weight of the governmental interest considered in abstract terms," but "how the speech at issue *affects* the government's interest in providing services efficiently." *Id.*

The government need not wait for disruption of its services, however. *Graziosi v. City of Greenville*, 775 F.3d 731, 741 (5th Cir. 2015) (it is unnecessary "for an employer to allow events to unfold to the extent that the disruption of the office and the destruction of working relationships is manifest before taking action" (quoting *Connick*, 461 U.S. at 152)). A "prudent government administrator will often wish to take action before a risk ripens into an actual workplace disruption," and so the "key limitation on preemptive action . . . is that the officials' predictions of disruption must be *reasonable*." *Kinney*, 367 F.3d at 364 (emphasis in original). The government need not limit its evaluation to internal workplace disruptions either; disruptions to its services may stem from its relationship with the public. *See Carroll v. City of Jefferson*, No. 2:21-CV-392-

RSP, 2022 WL 3141860, at *6 (E.D. Tex. Aug. 5, 2022); *Rankin v. McPherson*, 483 U.S. 378, 388 (1987) ("the test focuses on the effective functioning of the public employer's enterprise"). No matter the source of the disruption, "before an employer may justifiably discharge an employee on a belief that the employee's speech has caused or will cause significant disruption to the workplace, *the employer must undertake a reasonable investigation of the facts to determine what the employee actually said*." *Salge v. Edna Indep. Sch. Dist.*, 411 F.3d 178, 192 (5th Cir. 2005) (emphasis in original).

Given this "factually-sensitive balancing test," *Pickering* generally applies only at summary judgment, not at the motion to dismiss stage. *See Kaelin*, 577 F. App'x at 311 (quoting *Kennedy v. Tangipahoa Par. Libr.*, 224 F.3d 359, 366 n.9 (5th Cir. 2000), *abrogated on other grounds by Twombly*, 550 U.S. at 563); *Brown v. City of Tulsa*, 124 F.4th 1251, 1269 & n.7 (10th Cir. 2025) (collecting cases recognizing that *Pickering* balancing generally requires a more fully developed record than is available on a motion to dismiss, given the "asymmetry of information" and the government's "burden of demonstrating its interest and proving disruption"). But this rule is not absolute. Rather, at the motion-to-dismiss stage, "there is a *rebuttable presumption* that no balancing is required to state a claim." *Garza v. Escobar*, 972 F.3d 721, 727 (5th Cir. 2020) (quoting *Burnside v. Kaelin*, 773 F.3d 624, 628 (5th Cir. 2014)) (emphasis added).

### B. Analysis

#### i. *First Amendment Retaliation*

The first and fourth elements of De Leon's claim for First Amendment retaliation are uncontested; he suffered an adverse action by being terminated from his position as Poet Laureate after he posted his elegy of Dr. Rodriguez.

**Public Concern.** As pled, De León engaged in First Amendment speech as a citizen. The elegy was not "written pursuant to [De León's] official [job] duties." *Garcetti*, 547 U.S. at 421. The content, form, and context of the elegy also favor De León.

First, the content concerned matters of public concern. De León's elegy, written in his role as a citizen, commented on the evolution of Chicano language, contained critical commentary, honored and celebrated the life of Dr. Rodriguez, a known figure in the Chicano community, and was not a "solely personal matter." *Kennedy*, 224 F.3d at 373. Second, the speech's form indicates it was of public concern. It was posted on De León's public Facebook page and generated public commentary and discussion, which demonstrates "legitimate news interest." *Lane*, 573 U.S. at 241; *see also Graziosi*, 775 F.3d at 739 (finding that speech on Facebook weighs the form factor in favor of finding a matter of public concern because Facebook is a "medium accessible by the community"). And third, context reflects that De León's speech was of public concern, as Dr. Rodriguez's death was covered in multiple news outlets. ECF No. 24 at 19 n.7; *Salge*, 411 F.3d at 188 ("speech was of interest to community members and of greater importance" because of "familiarity with the issues").

The City focuses solely on the word "mayate" in arguing that De León's speech was not a matter of public concern. But "the Supreme Court's cases teach that we cannot isolate [an] offensive word from the broader context." *Bennett v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 977 F.3d 530, 549 (6th Cir. 2020) (Murphy, J., concurring). The City's position would extend the doctrine of unprotected speech to racial slurs. While some may find a word offensive, the First Amendment protects "even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v. Phelps*, 562 U.S. 443, 461 (2011).

But that is not the end of the story. "A statement's offensive nature may well make it unprotected under *Pickering* balancing." *Bennett*, 977 F.3d at 550 (Murphy, J., concurring).[7] The Court proceeds to this next step.

***Pickering* Balancing.** While De León is entitled to a rebuttable-presumption that balancing is inappropriate at this stage, Jones can prevail if "reasonable inferences drawn from [the] complaint do not plausibly show that [De León's] interests outweigh the [City's]." *Garza*, 972 F.3d at 727 (quoting *Burnside*, 773 F.3d at 728). Under *Pickering*, the relevant inquiry is whether the City's interest in not having De León use what it considered to be a racial slur outweighs his interest in using the word in his elegy. *See Bennett*, 977 F.3d at 538 & n.2. Because De León pleads his "way into *Pickering*," the Court cannot "ignore the very facts [he] pled" and "*must accept them as true.*" *Garza*, 972 F.3d at 728 (emphasis in original).

True, De León pled that Jones terminated him "because he had used a racial slur [mayate] in a poem on his Facebook." ECF No. 10 ¶ 92. If this was all, his claim would likely survive, because it would establish De León was terminated solely for the content of his speech, not any reasonable apprehension of disruption. But De León's pleadings and attachments, taken as true, reveal the City's interests behind its decision and establish that Jones' acted as a "prudent government administrator" in reasonably predicting disruption with the City's relationship with the public would result—indeed, already had resulted—from De León use of "mayate." *Kinney*, 367 F.3d at 365; *Carroll*, 2022 WL 3141860, at *6.

First, De León admits disruption, alleging the commentary on his Facebook post sparked concern within the community about his use of an offensive and racist term. De León even publicly

---

[7] *Bennett* is instructive. There, a former Emergency Telecommunicator employed by the city police department sued after she was terminated for posting a racial slur on her public social media page in an otherwise generic political post celebrating Donald Trump's 2016 victory. *Id.* at 533–34. While the post itself was on a matter of public concern, the Sixth Circuit separated the racial slur for purposes of *Pickering*. *Id.* at 538–39.

apologized, demonstrating awareness of the issue. But while acknowledging that some were offended by his use of the word, he continued to contest allegations of his improper use of the word. De León's allegations establish that it was only *after* this occurred that Jones terminated De León.

Second, the City's Termination Letter explains the City's interests behind its decision, including its compliance with the City's Non-Discrimination Ordinance, that the "City's Poet Laureate serves to promote poetry in compliance with the City's values," which "unite the community, denounce racism, and work to create equitable communities for all our residents," and that De León was terminated when it had "come to the City's attention that [he] recently posted a poet that *included a racial slur*," which was "contrary to the City's principles and is unbecoming of the City's Poet Laureate." ECF No. 10-4 (emphasis added).

Taken together, this makes clear that De León was terminated "specifically for [his] use of a racial slur, for [his] lack of regret for doing so, and for the disruption it caused," *Bennett*, 977 F.3d at 538 n. 3, namely disruption to the "effective functioning" of the City's Poet Laureate "enterprise." *Rankin*, 483 U.S. at 388.

De León seeks to avoid this outcome by alleging that "mayate" is not a racial slur as used in the elegy and that his termination was instead emblematic of "cancel culture." ECF No. 24 at 1. But the Fifth Circuit has several times found "mayate" equates to the "n-word." *Johnson v. PRIDE Indus., Inc.*, 7 F.4th 392, 401 & n.8 (5th Cir. 2021); *Rhines v. Salinas Const. Techs., Ltd.*, 574 F. App'x 362, 364 & n.2 (5th Cir. 2014) (record established that supervisors called an employee "mayate ," which is Spanish for "ni—er" or "monkey"). And at the pleading stage, the Court need not "accept as true . . . unwarranted factual inferences." *Heinze v. Tesco Corp.*, 971 F.3d 475, 479 (5th Cir. 2020) (quoting *In re Great Lakes Dredge & Dock Co.*, 624 F.3d 201, 210 (5th Cir. 2010)).

De León's allegation that "mayate" is not a racial slur, even as used in the elegy, is an unwarranted factual inference, given Fifth Circuit precedent to the contrary and his admission that some, including those who commented on his Facebook post, believed it to be one. ECF No. 10 ¶ 73 ("Certain Facebook users condemned Mr. De León's choice of the word "mayates" as an offensive or racist term").

While "arguably inappropriate or controversial character of a statement is irrelevant to the question whether [speech] deals with a matter of public concern," *Snyder*, 562 U.S. at 453 (citation and internal quotation marks omitted), it is relevant to the *Pickering* inquiry. This is because the *Pickering* test is a "sliding scale under which 'public concern' is weighed against disruption; '[a] stronger showing of disruption may be necessary if the employee's speech more substantially involves matters of public concern.'" *Matherne v. Wilson*, 851 F.2d 752, 761 (5th Cir. 1988) (internal punctuation omitted) (quoting *Gonzalez v. Benavides*, 774 F.2d 1295, 1302 (5th Cir. 1985)). On the other hand, where the speech at issue "at most only minimally touch[ed] on matters of public concern . . . the government's burden, at the balancing stage, is at its lowest." *Festa v. Westchester Med. Ctr. Health Network*, 380 F. Supp. 3d 308, 321 (S.D.N.Y. 2019) (quoting *Blackman v. New York City Transit Auth.*, 491 F.3d 95, 99 (2d Cir. 2007)). Racial slurs occupy this rung. As courts have recognized, "racial slurs impart[] no socially or potentially relevant message" themselves, *Warren v. Warrior Golf Cap., LLC*, 126 F. Supp. 3d 988, 994 (E.D. Tenn. 2015), and so are on the far end of *Pickering*'s sliding scale. *See Grutzmacher v. Howard County*, 851 F.3d 332, 347 (4th Cir. 2017) (holding that a firefighter's racially charged comment is not "of the same ilk" as speech by government employees about public policy problems in their workplace). Indeed, "[c]ourts routinely find that a plaintiff's right to engage in racist off-duty speech that does not touch on any matter of public concern is outweighed by public agencies'

interest in a harmonious work environment and a positive relationship with the public they serve." *Festa*, 380 F. Supp. 3d at 321–22 (collecting cases).

De León's position would imply that the City be required to retain De León as its Poet Laureate when it believes—as demonstrated by De León's own pleadings and attachments—that his use of a racial slur disrupted the functioning of its Poet Laureate enterprise and contradicted the City's purpose behind the initiative. The First Amendment does not require this.

As a backup, De León argues that the City needed to conduct a "reasonable investigation" into his speech before he was terminated. ECF No. 24 at 20 (citing *Salge*, 411 F.3d at 178, 192). De León contends that Jones should have spoken with him about the meaning of his elegy or contacted a linguist or speaker of Caló, and so the City violated his First Amendment rights by terminating him before they did so. *Id.* at 20–21. But whether De León himself believed "mayate" to be a racial slur is of no import in assessing whether the *City* reasonably acted in terminating him as Poet Laureate. *See Waters v. Churchill*, 511 U.S. 661, 677 ("courts look to the facts as the employer *reasonably* found them to be"). And *Salge*'s "reasonable investigation" is not a separate requirement, but part of the *Pickering* inquiry. It goes to the *content* of the speech when disputed by protecting employees from being terminated "without at least asking an employee what [he] said." 411 F.3d at 193. Here, De León's elegy was publicly posted on Facebook, there is no dispute about its *content*, and De León pled that Jones referenced it when she terminated him. ECF No. 10 ¶ 90.

Because the City meets the rebuttal presumption, De León fails *Pickering*, and his First Amendment retaliation claim falls. Accordingly, the Court need not address the "clearly established" prong of qualified immunity.[8]

## II.    Viewpoint Discrimination

De León also brings a separate First Amendment claim for viewpoint discrimination. In a similar vein to his retaliation claim, De León alleges that Jones terminated him because of his particular use of Caló. ECF No. 10 ¶ 170. De León claims his use of Caló in the elegy— "mayate"—expressed his viewpoint on the meaning and value of Caló, including "when and how such language should be used." *Id.* ¶ 172.

Typically, "[i]n the realm of private speech or expression, government regulation may not favor one speaker over another." *Rosenberger v. Rector and Visitors of Univ. of Va.*, 515 U.S. 819, 828 (1995). Such "viewpoint discrimination" generally is presumed unconstitutional and viewed with strict scrutiny. *Id.* That's because when "the government targets not subject matter, but particular views taken by speakers on a subject, the violation of the First Amendment is all the more blatant." *Id.* But when a viewpoint discrimination claim arises from the termination of a public employee, strict scrutiny may not apply. *See Hiers*, 2022 WL 748502, at *12 (discussing the lack of Supreme Court or Fifth Circuit precedent on whether strict scrutiny or *Pickering*

---

[8] De León would fail to meet this prong as well. True, it is clearly established that a public employee may not be discharged on the basis that infringes that employee's constitutionally protected interest in speech. *Rankin*, 483 U.S. at 383; *Haverda v. Hays County*, 723 F.3d 586, 599 (5th Cir. 2013) ("[T]here is no doubt that Haverda had a clearly established constitutional right not to be fired for engaging in protected speech."). This includes speech that is offensive or inappropriate. *Rankin*, 483 U.S. at 387. But here, *Pickering* requires Jones to balance competing interests in the unique context of the Poet Laureate enterprise. For this reason, the Fifth Circuit has recognized that government officials are rarely denied qualified immunity in these circumstances. *See Noyola v. Tex. Dep't of Hum. Res.*, 846 F.2d 1021, 1025 (5th Cir. 1988). De León points to no "controlling" or a "robust consensus of persuasive authority" that would have put Jones on notice that it was "*beyond debate*" that her termination of De León violated the First Amendment, *Swanson*, 659 F.3d at 371–72 (citing *Ashcroft v. al-Kidd*, 563 U.S. 731, 741–42 (2011)), considering Jones's statement to De León and the reasons given in the Termination Letter.

applies, but noting "other district courts and courts of appeals have indicated that *Pickering* applies to view-point discrimination claims brought by public employees").

De León offers no argument for why strict scrutiny applies. Assuming *Pickering* applies, De León's viewpoint discrimination claim fails for the same reason as his retaliation claim. Further, a viewpoint-based claim must target not merely a subject matter, "but particular views taken by speakers on a subject." *Vidal v. Elster*, 602 U.S. 286, 293 (2024). Here, De Leon merely asserts in a conclusory fashion that the City terminated him because he used the Caló language, which is insufficient to survive a Rule 12(b)(6) challenge.

## III.    Defamation by Implication

De León alleges that Jones and the City defamed him by releasing a press statement implying that De León posted a poem counter to the City's value of "denouncing racism." ECF No. 10 ¶¶ 184–85. De León argues that an objectively reasonable reader would believe that he was fired for "engaging in racist conduct." ECF No. 24 at 28.[9] The press release stated:

> The City of San Antonio's Department of Arts & Culture is committed to championing policies and practices that empower a just, inclusive, and equitable city which aligns with the City of San Antonio's mission statement and core values. *The City of San Antonio's Poet Laureate is to uphold these values, which include denouncing racism among other oppressive barriers*, while using creative poetic expressions to unite our community. *Nephtali De León recently posted a poem contrary to the City's values and the role of City Poet Laureate.* As a result, Mr. De León's contract with the City of San Antonio has been terminated.

ECF No. 10 ¶ 184 (emphasis added).

---

[9] Defendants argue the Court need not address this claim because it was not pled. ECF No. 25 at 15 n.8. True, De León did not expressly plead this theory. *See* ECF No. 10 ¶ 186 ("The implication that Mr. De Leon was terminated as Poet Laureate for posting a poem counter to the City's value of 'denouncing racism' is *among the implications* that an objectively reasonable reader would draw from the City's press statement.") (emphasis added). The Court construes this additional implication as a motion for leave to amend and grants the motion. *See Pierce v. Hearne Indep. Sch. Dist.*, 600 F. App'x 194, 200 & n.6 (5th Cir. 2015).

De León further alleges that Defendants made additional defamatory statements to local news outlets by sharing an internal email from the Assistant City Manager Lori Houston that stated De León "posted a poem that included a Spanish racial slur." *Id.* ¶ 187.

To begin, the Court **DISMISSES** De León's defamation claim against Jones, as De León failed to plead any statement from Jones in her individual capacity, as opposed to the City.

For its part, the City raises two arguments: first, that governmental immunity shields the City because the Poet Laureate program is a governmental function under the TTCA; and second, that the statements are "substantially true." The Court takes each in turn.

### A. Governmental Immunity

"A municipality is a governmental entity entitled to sovereign immunity, but only for some of its functions." *Tex. Bay Cherry Hill, L.P. v. City of Fort Worth*, 257 S.W.3d 379, 389 (Tex. App.—Fort Worth 2008, no pet.). "A municipal corporation exercises two kinds of functions, proprietary functions and governmental functions." *Id.* "The governmental/proprietary dichotomy recognizes that immunity protects a [municipality] from suits based on its performance of a governmental function but not a proprietary function." *Wasson Interests, Ltd. v. City of Jacksonville*, 559 S.W.3d 142, 146 (Tex. 2018) ("*Wasson II*").

Determining a municipality's immunity from suit is a two-step inquiry: (1) whether the claim arises out of governmental or proprietary functions and (2) if it is governmental, whether immunity is waived under the TTCA. *Tex. Bay Cherry Hill,* 257 S.W.3d at 389. Here, the Court need only address the first step, as the TTCA has not waived municipal immunity for claims arising out of intentional torts, including defamation. *See Fishbeck v. Lavaca County*, No. 6:22-CV-2, 2022 WL 4588415, at *5 (S.D. Tex. Sep. 29, 2022).

The Parties agree that De León's defamation claim "arises from" the operation of the City's Poet Laureate program. TEX. CIV. PRAC. & REM. CODE § 101.0215(a).[10] The issue is whether the City's Poet Laureate program is a governmental or proprietary function under the TTCA. Section 101.0215 of the TTCA contains a nonexclusive list of thirty-six functions the Legislature specifically identified as governmental and three identified as proprietary. TEX. CIV. PRAC. & REM. CODE § 101.0215(a). Governmental functions range from "police and fire protection and control" to "animal control," and include "museums," "libraries," "civic, convention centers, or coliseums," and "neighborhood, or senior citizen centers." TEX. CIV. PRAC. & REM. CODE §§ 101.0215(a)(1), (14)–(17), (33). Proprietary functions, on the other hand, are (1) the operation and maintenance of a public utility, (2) amusements owned and operated by the municipality; and (3) any activity that is abnormally dangerous. *Id.* §§ 101.0215(b)(1)–(3). Both lists are mutually exclusive, non-exhaustive, and a Poet Laureate program appears on neither.

Because the TTCA does not enumerate a Poet Laureate program as governmental or proprietary, this Court "must apply the general definitions" to determine which bucket it falls under. *Wasson II*, 559 S.W.3d at 150. A four-factor test guides the inquiry: whether the City's Poet Laureate program (1) was "mandatory or discretionary"; (2) "intended to benefit the general public or the City's residents"; (3) done "on the State's behalf or on its own behalf"; and (4) "sufficiently related to a governmental function to render the act governmental even though it would have been proprietary." *Wasson II*, 559 SW.3d at 150.

At this stage, the Court agrees with De León that the Poet Laureate program is a proprietary function. First, the Court is unaware of, and the City has not pointed to, any statutory requirement

---

[10] *Cf. City of Dallas v. Moreau*, 718 S.W.2d 776, 779 (Tex. App.—Corpus Christi 1986, writ ref'd n.r.e.) (alleged defamatory letter of termination circulated and posted on an employee bulletin board after a city marshall was fired arose out of the operation of the police department, a governmental function).

to create or operate the Poet Laureate program. Instead, the Poet Laureate program appears to be of the City's own creation. *See City of League City v. Jimmy Changas, Inc.*, 670 S.W.3d 494, 498, 504 (Tex. 2023) (economic development incentives grant agreement was "clearly" discretionary where no statute required the city to use public funds to promote economic development or to stimulate local business).

Second, while the City's Poet Laureate promotes the arts generally, the Agreement reveals the City's Poet Laureate was intended to "primarily" benefit the City's residents. *Wasson II*, 559 S.W.3d at 151; *see* ECF No. 10-1 at 1–2 (stating that De León was to "serve as *the City's* Poet Laureate," to "promote poetry and the literary arts *in San Antonio*, and to "promote literacy *in the community*") (emphasis added). While the City argues that the Agreement demonstrates the Poet Laureate program is "outward-facing" because De León's poems were licensed by the City for, in part, "tourism" in San Antonio, this still primarily benefits the City's residents by bringing income to the City. These two factors are likely enough. *City of League City*, 670 S.W.3d at 505. But the others favor De León as well.

Third, the Agreement does not indicate the City's Poet Laureate was done on Texas' behalf. While local activities "can improve *the State's* overall economy," the terms of the Agreement "do not indicate in any way that the City entered into it on the State's behalf." *City of League City*, 670 S.W.3d at 505 (emphasis in original). As De León points out, the only parties to the Agreement are De León and the City (signed for by Jones in her capacity as the Executive Director of the DAC). And fourth, while the City argues the Poet Laureate is closely related to the listed governmental functions including museums, libraries, and community and neighborhood centers, the Texas Supreme Court has held that "not all activities 'associated' with a governmental function are 'governmental.'" *Id.* Instead, "a city's proprietary action may be treated as governmental only

if it is essential to the city's governmental actions." *Id.* While a valuable addition that benefits the City's residents, nothing suggests that the City's Poet Laureate program is *essential* to the operation of museums, libraries, and community neighborhood centers. The City's argument that "[h]aving a poet laureate is governmental because governments have poets laureates," ECF No. 14 at 19, would turn anything the City does into a governmental function. This would eviscerate the Legislature's decision to afford municipal immunity to governmental functions but not proprietary ones, even though both are *performed* by municipalities themselves.

Accordingly, the City is not entitled to governmental immunity based on its operation of the City's Poet Laureate program.

## B. Merits

### i.    *Applicable Law*

To maintain a defamation cause of action under Texas law, the plaintiff must show: "(1) the defendant published a false statement; (2) that defamed the plaintiff; (3) with the requisite degree of fault regarding the truth of the statement (negligence if the plaintiff is a private individual); and (4) damages (unless the statement constitutes defamation per se)." *In re Lipsky*, 460 S.W.3d 579 593 (Tex. 2015); *WFAA–TV, Inc. v. McLemore*, 978 S.W.2d 568, 571 (Tex. 1998); *see also Sabal v. Anti-Defamation League*, No. 4:23-CV-1002-O, 2024 WL 1892303, at *8–9 (N.D. Tex. April 30, 2024) (discussing a third category of "limited-purpose public figures").

"A statement is considered defamatory under Texas law if it tends to injure a person's reputation and thereby expose the person to public hatred, contempt, ridicule, or financial injury or to impeach any person's honesty, integrity, virtue, or reputation." *Parker v. Spotify USA, Inc.*, 569 F. Supp. 3d 519, 528 (W.D. Tex. 2021) (citation and internal quotation marks omitted). For a defamation claim in Texas, "whether the words used 'are reasonably capable of a defamatory

meaning' is the threshold question.'" *Id.* (quoting *Dallas Morning News, Inc. v. Tatum*, 554 S.W.3d 614, 624 (Tex. 2018)). This is an objective, not subjective, inquiry. *Id.*

Several types of statements are not capable of a defamatory meaning. These include true statements and statements that are not verifiable as false. *See Parker*, 569 F. Supp. 3d at 529. And "even when a statement is verifiable, it cannot give rise to liability if 'the entire context in which it was made' discloses that it was not intended to assert a fact." *Tatum*, 554 S.W.3d at 638 (citing *Bentley v. Bunton*, 94 S.W.3d 561, 581 (Tex. 2002)). "A statement that fails either test— verifiability or context—is called an opinion." *Id.*

The reasonable meaning of an allegedly defamatory statement is a question of law, involving two independent steps. *Tatum*, 554 S.W.3d at 625. "The first is to determine whether the meaning the plaintiff alleges is reasonably capable of arising from the text of which the plaintiff complains," and "[t]he second step is to answer whether the meaning—if it is reasonably capable of arising from the text—is reasonably capable of defaming the plaintiff." *Id.*

"'Textual defamation occurs when a statement's defamatory meaning arises from the words of the statement itself,' meaning the 'statement's literal text and its communicative content align—what the statement says and what the statement communicates are the same.'" *Parker*, 569 F. Supp. 3d 529 (quoting *Tatum*, 554 S.W.3d at 626–27). "Defamation by implication, on the other hand, is a subset of textual defamation that occurs '[w]hen a publication's text implicitly communicates a defamatory statement.'" *Parker*, 569 F.3d at 529 (quoting *Tatum*, 554 S.W.3d at 627). The defamatory nature of a textual statement can appear in one of three ways: (1) explicitly, (2) "implicitly as a result of the article's entire gist," or (3) "implicitly from a distinct portion of the article rather than from the article's as-a-whole gist." *Tatum*, 554 S.W.3d at 627. The "gist" of a statement "refers to a publication or broadcast's main theme, central idea, thesis, or essence." *Id.*

at 629. "Implication," on the other hand, "refers to the inferential, illative, suggestive, or deductive meanings that may emerge from a publication or broadcast's discrete parts." *Id.* Construction of meaning is likewise required for claims of defamation by implication. *Id.* at 629. "While the same general question of whether the publication is reasonably capable of being defamatory applies, 'the judge's task is to determine whether the implication the plaintiff alleges is among the implications that the objectively reasonable reader would draw.'" *Parker*, 569 F. Supp. 3d at 529 (quoting *Tatum*, 554 S.W.3d at 629–31).

But the substantial truth doctrine "precludes liability for a publication that correctly conveys a story's 'gist' or 'sting,'" *Tatum*, 554 S.W.3d at 629 (citation omitted), and "minor inaccuracies do not amount to falsity so long as 'the substance, the gist, [and] the sting' of the claim is justified," *Parker*, 569 F. Supp. 3d at 529 (quoting *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991)). "A statement is not actionable based on the substantial truth doctrine if 'in the mind of the average person who reads the statement, the allegedly defamatory statement is not more damaging to the plaintiff's reputation than a truthful statement would have been.'" *Id.* (citation omitted). A true gist, but not a true implication, can save a defendant from liability for publishing an otherwise factually defamatory statement. *Tatum*, 554 S.W.3d at 629.

Further, to balance against First Amendment concerns, "[f]or a court to subject a publisher to liability for defamation by implication, the 'plaintiff must make an especially rigorous showing' of the publication's defamatory meaning." *Id.* at 633 (quoting *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1092–93 (4th Cir. 1993)). This requires a plaintiff to "point to 'additional, affirmative evidence' within the publication itself that suggests the defendant 'intends or endorses the

defamatory inference.'" *Tatum*, 554 S.W.3d at 635 (quoting *White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990)).[11]

    ii.   *Analysis*

De León brings a defamation-by-implication claim. De León does not claim the "literal text" of the press release says his elegy was counter to the City's values of "denouncing racism." Instead, he argues that the implication said so, and that the "gist" of the release is that De León was fired for engaging in racist conduct. The City, much like the First Amendment context, focuses on the word "mayate" itself. It contends that De León used a word that "has an offensive racial meaning," that *this* is "substantially true," and so the press statement is not defamatory because the implication and gist is that De León was terminated for posting an elegy with the "offending word in it." ECF No. 25 at 14.

For starters, the Court disagrees with De León that the "gist" of the press statement is that De León was terminated for engaging in racist *conduct* rather than being terminated for posting the poem referenced in the press release. De León does not identify any conduct beyond the elegy itself. True, unlike other media statements that referenced the use of a racial slur,[12] the City's press release stated that De León posted a *poem* that was counter to the City's value of "denouncing

---

[11] In *Tatum*, the Texas Supreme Court provided a few indica of this type of evidence: does the publication (i) clearly disclose the factual bases for the statements it impliedly asserts; (ii) accuse the plaintiff in a defamatory manner as opposed to simply reciting that others have accused the plaintiff or the same conduct; (iii) report separate sets of facts, or does it link the key statements together; and (iv) specifically include acts that negate the implications that the defendant conjures up; and (v) does the allegedly defamatory implication align or conflict with the article's explicit statements. *Tatum*, 554 S.W.3d at 635 (cleaned up).

[12] The internal email from the Assistant City Manager Lori Houston stated De León "posted a poem that included a Spanish racial slur." ECF No. 10 ¶ 110. This statement specifically mentioned the use of a single word that De León admits others believe has a "racist origin and connotation," *id.* ¶ 72, and the categorization as "Spanish" is a minor inaccuracy. De León does not explain what the implication or "gist" of this statement is, and offers no response to the City's argument of substantial truth. The Court agrees with the City.

racism." But assuming the implication is, as De León contends, that his *elegy endorsed racism*, his defamation claim fails because accusations of racism in the abstract are not actionable.

Terms like "racist" or "racism" lack precise meaning, are "inherently value-laden," "conjure[] a vast array of highly emotional responses that will vary from reader to reader," and are not "susceptible to reasoned methods of verification." *Olthaus v. Niesen*, 232 N.E. 932, 940 (Ohio Ct. App. 2023) (citation and internal quotation marks omitted); *see generally* David Elder, Defamation: A Lawyer's Guide § 8:31 (Oct. 2024 update) ("Generalized statements specifically imputing racism or bigotry are generally subsumed under the opinion rule as non-actionable."). Typically, absent "accusation[s] of concrete, wrongful conduct," "charging a person with being racist" is not actionable. *La Liberte v. Reid*, 966 F.3d 79, 93 (2d Cir. 2020) (applying California tort law); *see also McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 358 (3d Cir. 2020) (applying Pennsylvania tort law, "derogatory characterizations without more are not defamatory," concluding that "a simple accusation of racism is not enough"); *Stevens v. Tillman*, 855 F.2d 394, 402 (7th Cir. 1988) (applying Illinois tort law, the derogatory characterization of the plaintiff as a "racist" was non-actionable because it did not "impl[y] the existence of undisclosed, defamatory facts").

This distinction makes sense. Accusing someone of racist conduct, such as engaging in racist and discriminatory abuse, or hurling racial epithets to another, may be defamatory because it is verifiable as true or false.[13] On the other hand, accusing someone of being a racist or endorsing

---

[13] Sister courts agree. *See Penders v. Saint Edward's University, Inc.*, No. 1:22-CV-178-DAE, 2024 WL 4744060, at *16–17 (W.D. Tex. Mar. 18, 2024) (holding that the gist of being "found guilty of race discrimination" and "racism and bias" was capable of verification because there was *additional evidence* to support the allegations that defendant "conveyed" this message, such as accusing him of saying the "N word" in front of players, telling only Black players to remove their face coverings, explaining his family's racist history, and being insensitive to Black people); *see also Sabal v. Anti-Defamation League*, No. 4:23-CV-1002-O, 2024 WL 1892303, at *5 (N.D. Tex. April 30, 2024) (holding that whether the plaintiff was "known to peddle antisemitic beliefs, including the 'antisemitic trope of blood libel,'" was capable of being proven true or false, "[t]aking as true the allegations that Sabal has never

racism in the abstract sense is not. *See La Liberte*, 966 F.3d at 93 (citing *Overhill Farms, Inc. v. Lopez*, 190 Cal. App. 4th 1247, 1262 (2010)); *McCafferty*, 955 F.3d at 358 ("the accusation must imply more, by for instance suggesting that the accused had personally broken the law to act[] in a racist manner." (citation and internal quotation marks omitted)).

Here, the City's press release did not imply the existence of additional wrongful conduct besides De León's elegy itself. As explained above, De León's theory that the "gist" is that he was fired for engaging in racist conduct merely renames the implication of racism as conduct, without identifying any conduct. The alleged implication also does not call *De León himself* a racist—it states his *elegy endorsed racism*. Whether a work of art endorses racism in the abstract is even further afield from verifiability.

An objectively reasonable person would also read this implication as being the *City's opinion* of De León's elegy. The press release explicitly referred to De León's elegy as contrary to the City's "*values*," which are themselves subjective and indicative of the City's beliefs.

Accordingly, the Court finds that the implication is not verifiable, an objectively reasonable person would view the implication as the City's opinion, and so De León's defamation claim fails.[14]

---

expressed or endorsed antisemitic views"); *Patton v. Adesa Texas, Inc.*, 985 F. Supp. 2d 818, 822 (N.D. Tex. 2013) (accusation of "making racist remarks" may be actionable when it is a "false accusation[] without a factual basis").

[14] As there is no objectively reasonable implication or gist that is defamatory, the Court need not reach whether the *Tatum* factors support De León's claim.

## CONCLUSION

For the foregoing reasons, Defendant's Partial Motion to Dismiss (ECF No. 14) is **GRANTED**. De León's Section 1983 claims and defamation claims are **DISMISSED WITH PREJUDICE**.[15] De León's breach-of-contract claim against the City will **PROCEED**.

It is **SO ORDERED**.

**SIGNED** this 23rd day of April, 2025.

XAVIER RODRIGUEZ
UNITED STATES DISTRICT JUDGE

---

[15] Any further amendment would be futile, as no further factual allegations could alter the legal analysis at this stage. *Marucci Sports, L.L.C. v. Nat'l Collegiate Athletic Ass'n*, 851 F.3d 368, 378 (5th Cir. 2014).